917 P.2d 692

**STATE of Arizona, Appellee,**

v.

**Darrel E. LEE, Appellant.**

Nos. **CR–93–0111–AP, CR–93–0323–T/AP.**

Supreme Court of Arizona,
En Banc.

May 21, 1996.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals,

**552**

and Susanna C. Pineda, Assistant Attorney General, Phoenix, for Appellee.

Michael J. Burke, La Paz County Public Defender, Parker, for Appellant.

## OPINION

ZLAKET, *Vice Chief Justice.*

### FACTS AND PROCEDURAL HISTORY

On December 5, 1991, defendant Darrel E. Lee and a companion, Karen Thompson, approached 57–year–old John Anderson as he was leaving a Phoenix medical clinic and asked him for a ride. When Anderson agreed, they got into his car. Although unarmed, Lee announced that he had a gun and directed Anderson to drive south on the freeway. When they arrived in Chandler, Thompson demanded Anderson's wallet, which contained a small amount of cash, some credit cards, and an automatic teller machine (ATM) card. Thompson, accompanied by defendant, used the ATM and credit cards repeatedly throughout the next five days, both before and after Anderson's murder.

At some point, defendant suggested that they tie up Anderson and dump him alongside the road. After binding his hands and feet and placing him in a ditch, however, the couple decided not to leave him there. Instead, they put him in the trunk of the car. During most of this time, Anderson was pleading for his life.

Defendant and Thompson drove back to Phoenix and then toward California, stopping frequently to use cocaine and alcohol. They eventually decided to kill Anderson to avoid apprehension. Defendant stated that he would asphyxiate Anderson with the car's exhaust fumes and obtained a hose for this purpose. The couple discussed the anticipated killing as they continued their journey. Approximately eight hours after placing Anderson in the trunk, defendant and Thompson turned back toward Phoenix.

Anderson somehow managed to get untied and pry open the trunk of the car. He found a windshield sun screen reading "NEED HELP; CALL POLICE," and held it out of the vehicle. Two men in another car saw the sign and the frightened victim and called the police at the first available telephone. At approximately 11:45 p.m., two officers responded to the call. Because of darkness and rugged terrain in the area, however, they were able to conduct only a rudimentary search.

Meanwhile, defendant had exited the interstate highway and stopped the car at about 10:30 p.m. He and Thompson attempted to suffocate Anderson with car fumes by running the hose from the exhaust pipe into the trunk, but were unsuccessful because Anderson kept pushing up the trunk lid. During a pause in which the couple used more cocaine and discussed the situation, the victim escaped from the trunk and attempted to flee. Defendant chased Anderson and wrestled him to the ground. Thompson then brought defendant a belt, with which he attempted to strangle Anderson. The belt broke, and defendant yelled for Thompson to get a rock. As defendant choked Anderson with his hands, Thompson hit the victim in the head with the rock, fracturing his skull.

Defendant and Thompson placed the body in the trunk of the car. After driving to California, and then back to Phoenix, the couple eventually went to Tucson. There, they purchased a shovel and buried Anderson in a shallow grave outside the city.

The foregoing facts are taken primarily from Thompson's testimony. Defendant initially denied all participation in the crimes, later admitted some involvement with the car and the credit card spending in California, and finally confessed to a defense-requested psychiatrist that he was present during the murder and was holding Anderson down when Thompson struck him. Evidence found at the scene of the crime included the sun shield, pieces of a belt containing blood spatters, defendant's prescription sunglasses, and a rock bearing blood and hair. Anderson's trifocals were found in the trunk of the automobile, along with blood stains matching his type. Information given by Thompson after she entered into a plea agreement in April 1992 led to the discovery of the victim's remains.

On January 28, 1992, a La Paz County grand jury indicted defendant and Thompson on one count each of first-degree murder, kidnapping, theft, armed robbery, and credit card theft. Defendant pleaded not guilty to all charges. Thompson entered a plea of guilty to first-degree murder and armed robbery. A condition of her plea agreement was that she testify against defendant. On November 18, 1992, following a jury trial, defendant was convicted on all counts.

An aggravation/mitigation hearing was conducted, and on March 8, 1993, the trial judge sentenced defendant to death for first-degree murder. He found in aggravation that defendant had a prior felony conviction involving the use or threat of violence (pursuant to the former version of A.R.S. § 13–703(F)(2)); that he had participated in this killing for pecuniary gain (A.R.S. § 13–703(F)(5)); and that the murder was perpetrated in an especially cruel manner (A.R.S. § 13–703(F)(6)). He also determined that the following mitigation existed but was not substantial enough to call for leniency: that defendant was remorseful (but only long after the killing); that he admitted his guilt (but only after being convicted); that he lacked education and had a low level of intelligence (but not significantly low); that he had strong family support (but which apparently had not favorably influenced his behavior in the past); that he was a "follower" by nature (but rather than being under Thompson's control was a full and willing participant in the murder); that Thompson received a life sentence (but only pursuant to a plea agreement that defendant had also been offered and had rejected); and that the prosecutor had recommended against the death penalty.

After finding that the kidnapping and armed robbery were dangerous offenses, the court sentenced defendant to 21 years on each charge. It also sentenced him to 2.5 years for credit card theft and 10 years for theft. All sentences were consecutive to each other and to the death sentence.

On March 8, 1993, an automatic notice of appeal from the death sentence was filed. On March 18, 1993, defendant filed a notice of appeal from his other convictions and sentences. The appeals were consolidated before this court. We affirm all convictions and the death sentence, but modify the sentences for kidnapping, armed robbery, and theft.

## PRELIMINARY ISSUES

Defendant raises numerous issues relating to trial and sentencing. Three of these are constitutional arguments that have already been rejected by this court and the United States Supreme Court. Requiring capital defendants to prove mitigating circumstances by a preponderance of the evidence is not unconstitutional. *Walton v. Arizona*, 497 U.S. 639, 649–52, 110 S.Ct. 3047, 3055–56, 111 L.Ed.2d 511 (1990); *State v. West*, 176 Ariz. 432, 455, 862 P.2d 192, 215 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1994). Capital sentencing by a judge instead of a jury is not constitutionally prohibited. *Walton*, 497 U.S. at 647–50, 110 S.Ct. at 3054–55; *West*, 176 Ariz. at 454, 862 P.2d at 214. Lastly, the death penalty is not unconstitutionally arbitrary and capricious in its application. *West*, 176 Ariz. at 455, 862 P.2d at 215. We decline to reconsider these previous rulings.

Defendant also challenges the constitutionality of Arizona's death penalty statute when aggravating and mitigating circumstances are "in balance." *See, e.g., State v. Richmond*, 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977). We see no need to address this argument; it is based entirely on the assertion that such a balance exists in this case, a premise with which we do not agree.

## ALLEGED TRIAL ERRORS

Defendant raises two claims of error at trial: improper prosecutorial vouching of witnesses and improper refusal to grant a change of venue. He argues that his right to a fair trial under the United States Constitution's Sixth and Fourteenth Amendments and Article 2, Sections 4 and 24 of the Arizona Constitution was violated. We disagree and affirm all convictions.

*Prosecutorial Vouching*

■ Defendant claims that the prosecutor impermissibly vouched for witnesses Karen Thompson and Gene Vernoy during closing argument. While discussing certain evidence, the prosecutor stated with regard to Thompson, "[n]ow she's been, I think, honest when she says she wasn't even aware that [other witnesses] had seen her . . . ." Additionally, in arguing that defendant had dropped his glasses at the scene, the prosecutor expressed his personal belief that there was no other way for them to have been found there. He also stated, regarding Gene Vernoy's less-than-accurate description of the person who was seen with Thompson, "I think he was an honest man, certainly an honest man, but I think he made an honest mistake." Defense counsel did not object to any of these statements at trial. Failure to object constitutes waiver absent fundamental error. *State v. Cannon*, 148 Ariz. 72, 79, 713 P.2d 273, 280 (1985).

■ It is impermissible for a prosecutor to place the prestige of the government behind his witnesses or suggest that information not presented to the jury supports a witness's testimony. *State v. Vincent*, 159 Ariz. 418, 423, 768 P.2d 150, 155 (1989). That did not occur here. The prosecutor essentially conceded that Thompson and Vernoy had been mistaken in parts of their testimony (regarding the presence of another car in the area, and the size of the man seen with the woman). Moreover, the remark pertaining to defendant's glasses was more about the physical evidence at the scene than about Thompson's testimony. Defendant had maintained that the glasses were found in a position that would be unexpected if they had fallen off while being worn. The prosecutor's argument, read in context, was that even though Thompson might have been wrong when she said defendant had his glasses on during the struggle, the fact that they were found at the location made it immaterial whether they fell off his face or out of his pocket.

In any event, these remarks do not rise to the level of fundamental error, which by definition must strike at the very foundation of the case, *State v. Libberton*, 141 Ariz. 132, 138, 685 P.2d 1284, 1290 (1984), nor is there any reasonable likelihood that they affected the jury verdict. *State v. Bracy*, 145 Ariz. 520, 526, 703 P.2d 464, 470 (1985), *cert. denied*, 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986). The evidence supporting Karen Thompson's story was compelling. The prosecution corroborated different parts of it with at least five independent witnesses. Moreover, Thompson was willing to implicate herself as the more active participant in the events that took place.

Even apart from Thompson's testimony, however, there was evidence that defendant was with her a few days before the killing, a few minutes before the victim disappeared from the medical center, and a few hours after his death; that Thompson was accompanied by a man less than an hour after the murder and by someone in the car with her minutes before it; that defendant had possession of the victim's car days later; and that defendant's prescription glasses, which he claimed to have lost on or about December 2, were seen on his face December 5, minutes before the victim disappeared, and were found by police at the scene of the homicide.

Vernoy's testimony was relatively tangential and served only to place Thompson with a man, perhaps taller than she, possibly mustached, and maybe Hispanic, in California shortly after the murder. The prosecutor's comments about it were insignificant.

*Request for Change of Venue*

On October 5, 1992, defendant filed a motion for change of venue based on a six-sentence story published in a local newspaper over six months before the trial. The third of five articles under a cumulative headline on page ten, it referred to a letter written by defendant to the trial judge requesting new counsel. In the correspondence, defendant reportedly complained that the only thing his attorney had told him was to take a plea bargain because he felt there was no chance of winning at trial. The article contained neither comment nor opinion about the letter or its contents. The trial court denied the motion without prejudice.

It was later renewed following voir dire because some jury panel members indicated that they had read articles about the case. However, of the 6 prospective jurors and alternates who made this admission, only 4 had read the newspaper in question within the past year. None were asked about or volunteered having seen the subject article. The court again denied the motion.

Defendant argues that the article was "so outrageous that it [turned] the trial into a mockery of justice or a mere formality," *State v. Bible*, 175 Ariz. 549, 563, 858 P.2d 1152, 1166 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994), and that this court should presume prejudice without regard to the voir dire responses. *See Rideau v. Louisiana,* 373 U.S. 723, 726–27, 83 S.Ct. 1417, 1419–20, 10 L.Ed.2d 663 (1963). According to him, the article was harmful because it conveyed the impression that even his attorney thought he was guilty. He therefore compares it to a public admission of guilt, which under some circumstances may require a change of venue. *See id.* at 727, 83 S.Ct. at 1420.

The argument is unpersuasive. The burden to show presumptive prejudice resulting from pretrial publicity "rests with the defendant and is extremely heavy." *Bible,* 175 Ariz. at 564, 858 P.2d at 1167. To grant relief, we would have to find that "the publicity was so unfair, so prejudicial, and so pervasive that we cannot give any credibility to the jurors' answers during voir dire affirming their ability to decide the case fairly." *Id.* at 565, 858 P.2d at 1168. The article here is a universe away from the type of publicity that "utterly corrupt[s]" a trial, *Murphy v. Florida,* 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975), and prejudice cannot be presumed. Instead of appearing as an admission of guilt, the story plainly implied that defendant disliked his attorney because the latter was ready to give up on the case. Defendant's request for a lawyer who would adequately defend him can hardly be viewed as a concession of culpability.

When a motion for change of venue is based on actual prejudice, the defendant must show that he or she will probably be deprived of a fair trial. *See* Rule 10.3(b), Ariz.R.Crim.P.; *see also State v. Stanley,* 167 Ariz. 519, 527, 809 P.2d 944, 952, *cert. denied,* 502 U.S. 1014, 112 S.Ct. 660, 116 L.Ed.2d 751 (1991). We review the trial court's ruling for an abuse of discretion, *see State v. Salazar,* 173 Ariz. 399, 406, 844 P.2d 566, 573 (1992), *cert. denied,* 509 U.S. 912, 113 S.Ct. 3017, 125 L.Ed.2d 707 (1993), and find none. Defense counsel had ample opportunity during voir dire to ask questions about pretrial publicity. After determining which prospective jurors had read stories about the case, he failed to establish that any of them had seen the article complained of here. Moreover, all those who expressed any doubt regarding their ability to be fair and impartial were excused.

## ALLEGED SENTENCING ERRORS

Defendant raises multiple sentencing issues and asserts that the imposition of the death penalty was improper in this case.

*Prosecutor's Late Notice of Intent to Seek the Death Penalty*

Defendant argues that the trial court erred in allowing the prosecutor to file a notice of intent to seek the death penalty after expiration of the legal time limit. *See* Rule 15.1(g)(1), Ariz.R.Crim.P. (requiring "notice of whether the prosecutor intends to seek the death penalty" within 30 days after arraignment). On February 3, 1992, the defendant was arraigned. On June 1, 1992, 87 days late, the state filed a written notice that was immediately opposed by the defense. The delay was apparently inadvertent, and the trial court determined that defendant had previously received actual notice of the state's intent, as evidenced by discussions that took place during plea negotiations and defense counsel's contacts with death penalty attorneys throughout Arizona. Defendant did not dispute that he had actual, oral notice. Thus, the trial court found no prejudice to defendant and denied a motion to preclude the state from seeking the death penalty.

Under these circumstances, we find no abuse of discretion. The trial court "may" impose a variety of sanctions if war-

ranted, "including, but not limited to," those specifically listed in Rule 15.7, Ariz.R.Crim. P.: "(1) ordering disclosure of the information not previously disclosed; (2) granting a continuance; (3) holding a witness, party, or counsel in contempt; (4) precluding a party from calling a witness, offering evidence, or raising a defense not disclosed; and (5) declaring a mistrial when necessary to prevent a miscarriage of justice." Thus, the discretion granted under this rule is quite broad. A defendant seeking to demonstrate an abuse of such discretion should be prepared to show some prejudice from surprise or delay. *State v. Martinez–Villareal*, 145 Ariz. 441, 448, 702 P.2d 670, 677, *cert. denied*, 474 U.S. 975, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985). Defendant suffered no prejudice here. It was apparent from plea negotiations and other conversations by and between counsel that the prosecutor's office intended to seek the death penalty. The trial court's failure to impose a particular sanction, or any sanction at all, was not an abuse of discretion.

■ Defendant also argues that the notice rule was enacted to ensure that the due process rights of capital defendants are protected. Thus, he urges, the state should not be permitted to violate the rule and still seek the death penalty. However, absent prejudice, the violation of a procedural rule designed to safeguard a constitutional right is not necessarily the same thing as a violation of the right itself. *See, e.g., State ex rel. Berger v. Superior Court*, 111 Ariz. 335, 339, 529 P.2d 686, 690 (1974) (applying this principle to "speedy trial" procedural rules). As defendant admits in his brief, "[t]he notice requirements ... were adopted to allow [capital defendants] to know, prior to trial, if the state is seeking to impose the death penalty." Here, defendant had actual notice of the state's intent and ample opportunity to prepare a defense, so due process was served. *See Huck v. Haralambie*, 122 Ariz. 63, 65, 593 P.2d 286, 288 (1979) (due process requires notice and a meaningful opportunity to be heard).

Our decision should not be interpreted as condoning the state's lack of compliance with the rule, nor do we accept its invitation to

hold that oral notification satisfies the requirement. A written notice provides safeguards to both sides and avoids disputes about who said what and when. We merely recognize that mistakes will occasionally be made, and these will require a judicial analysis that includes consideration of the consequences of late notice.

### Prosecutor's Recommendation for Life Sentence

Defendant argues that the trial court's imposition of a capital sentence after the prosecutor announced that the state no longer sought the death penalty was an abuse of discretion, a denial of due process, and cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

At sentencing, after affirming the presence of aggravating factors, the prosecutor stated that he thought "this is not a death penalty case," and recommended to the court that defendant should go to prison and never be released. He did, however, emphasize that the decision should be "in the court's hands and the court's sound discretion" and repeatedly referred to his characterization as merely an "opinion" and a "recommendation." The sole reason for the prosecutor's change of heart appears to have been that Karen Thompson, who admitted to striking the fatal blow, received a life sentence.

■ The court properly considered the state's recommendation for life as a mitigating factor, but we cannot say it erred in nevertheless imposing the death sentence. Although prosecutorial discretion to seek the death penalty extends into the sentencing phase, it "ends in a capital case with the prosecutor's decision to present or ignore evidence of aggravation." *State v. Brewer*, 170 Ariz. 486, 499, 826 P.2d 783, 796, *cert. denied*, 506 U.S. 872, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992). In *Brewer*, we held that the prosecutor was bound by his presentation of aggravating evidence after recommending a life sentence, even though he later asserted that he did so only because he believed it was required under law. *Id.* at 500, 826 P.2d at 797. Here, not only did the prosecutor present evidence in aggravation, he reasserted

that those factors were present even while making his recommendation for leniency. Moreover, as the prosecutor conceded, the trial judge still had the ultimate responsibility to decide the sentence.

Defendant's policy argument against *Brewer*, that to force a prosecutor not yet in possession of all mitigating evidence to make an irrevocable decision about whether to seek the death penalty could lead to arbitrary and capricious results, might have some merit if the premise were correct. *See Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (prohibiting "sentencing procedures that [create] a substantial risk that [the death penalty] would be inflicted in an arbitrary and capricious manner"). Rule 15.2(g), Ariz.R.Crim.P., however, requires disclosure of mitigation to the prosecution within 20 days after the verdict in a death penalty case. As a result, a prosecutor should be alerted to all mitigating evidence before passing the point of offering aggravating evidence.

*Aggravating Factors*

■ One of the three aggravating circumstances found by the trial court was that defendant had a prior felony conviction involving "the threat or use of violence." *See* former A.R.S. § 13–703(F)(2). This finding arose out of a 1987 Arizona robbery conviction. Defendant challenges the applicability of the (F)(2) aggravator under these circumstances.

We have held that to qualify under this section the prior conviction must be for a felony that by *statutory definition* involves the use or threat of violence. *State v. Gillies*, 135 Ariz. 500, 511, 662 P.2d 1007, 1018 (1983). "Violence" has been defined as "the exertion of any physical force so as to injure or abuse." *State v. Arnett*, 119 Ariz. 38, 51, 579 P.2d 542, 555 (1978).

A.R.S. § 13–1902(A) reads as follows:

A person commits robbery if in the course of taking any property of another from his person or immediate presence and against his will, such person threatens or uses force against any person with intent either to coerce surrender of property or to pre-vent resistance to such person taking or retaining property.

Thus, the crime requires the use or threat of force. "Fear of force is an element of robbery and the conviction of robbery presumes that such fear was present." *State v. Watson*, 120 Ariz. 441, 448, 586 P.2d 1253, 1260 (1978), *cert. denied*, 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979). Because the unwarranted imposition of fear is inherently abusive, a conviction for robbery necessarily involves violence or the threat of violence on another person. *See State v. Kemp*, 185 Ariz. 52, 64, 912 P.2d 1281, 1293 (1996). Consistent with this view, we have repeatedly found that robbery is a crime of violence. *See State v. Ramirez*, 178 Ariz. 116, 130, 871 P.2d 237, 251, *cert. denied*, — U.S. —, 115 S.Ct. 435, 130 L.Ed.2d 347 (1994); *State v. Spencer*, 176 Ariz. 36, 43, 859 P.2d 146, 153 (1993), *cert. denied*, 510 U.S. 1050, 114 S.Ct. 705, 126 L.Ed.2d 671 (1994); *State v. Tittle*, 147 Ariz. 339, 345, 710 P.2d 449, 455 (1985); *State v. Nash*, 143 Ariz. 392, 404, 694 P.2d 222, 234, *cert denied*, 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985); *State v. Watson*, 120 Ariz. at 448, 586 P.2d at 1260.

■ Defendant, however, points to *State v. Fierro*, 166 Ariz. 539, 549, 804 P.2d 72, 82 (1990), in which "violence" is defined as the exertion of any physical force *"with the intent to* injure or abuse." (Emphasis added). Defendant's reliance on that case is misplaced. As explained in *State v. McKinney*, 185 Ariz. 567, 581, 917 P.2d 1214, 1228 (1996), *Fierro* only intended to exclude from the (F)(2) aggravating factor those crimes that could be "committed with a mental state that was merely reckless or negligent." The Texas robbery statute under consideration in *Fierro* expressly permitted a conviction based on reckless conduct. The Arizona robbery statute does not. We decline defendant's request to hold otherwise and affirm the trial court's finding of the (F)(2) aggravating factor. We also reject the claim that the (F)(2) aggravating factor is unconstitutionally vague. *State v. Walden*, 183 Ariz. 595, 618, 905 P.2d 974, 997 (1995), *cert. denied*, — U.S. —, 116 S.Ct. 1444, 134 L.Ed.2d 564 (1996).

■ Defendant next challenges as an abuse of discretion, and thus a violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution, the trial court's finding under A.R.S. § 13–703(F)(5) that the murder was committed in expectation of pecuniary gain. To establish the pecuniary gain factor, the state must prove that the receipt of money was a cause of and a motivation for the murder, not just a result of it. *E.g., State v. Wallace,* 151 Ariz. 362, 368, 728 P.2d 232, 238 (1986), *cert. denied,* 483 U.S. 1011, 107 S.Ct. 3243, 97 L.Ed.2d 748 (1987). However, as we said in *State v. Rockwell,* 161 Ariz. 5, 14, 775 P.2d 1069, 1078 (1989), "[e]ven if [defendant] shot the victim after the money was taken ..., the murder was part and parcel of the robbery because it resulted in eliminating the only witness to the crime." *See also State v. Hensley,* 142 Ariz. 598, 604, 691 P.2d 689, 695 (1984) (victim killed to facilitate escape after robbery); *Libberton,* 141 Ariz. at 139, 685 P.2d at 1291 (1984) (victim killed to hinder detection of theft). The finding that this murder was committed to hinder detection so that defendant and Thompson could continue their use of the car and credit cards was supported by ample evidence and was not an abuse of discretion.

■ Finally, defendant challenges the "especially cruel" language of A.R.S. § 13–703(F)(6) as unconstitutionally vague. We have previously rejected this argument. *E.g., State v. Gretzler,* 135 Ariz. 42, 50–51, 659 P.2d 1, 9–10, *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). Furthermore, we agree with the trial court's finding that this murder was especially cruel.

### Mitigating Factors

Defendant argues that the trial court should have found in mitigation that: (1) his capacity to conform his conduct to the requirements of the law was impaired, (2) he was a minor participant in the murder, (3) he could not have reasonably foreseen the victim's death, (4) he had organic brain syndrome, (5) he was susceptible to rehabilitation, and (6) a felony-murder instruction was given to the jury. Defendant argues that proof of these factors was unrefuted and that they were therefore established by a preponderance of the evidence.

The trial court's failure to find the first five mitigators was not error. We do not accept defendant's claim that the evidence was uncontroverted. As is clear from reviewing the special verdict, the trial court considered all available evidence, including that which had been presented at trial, and rejected these proffered mitigators. *See* A.R.S. § 13–703(C) (trial court may consider evidence presented during the guilt phase to determine the existence or non-existence of aggravating or mitigating circumstances). Our independent review of the record supports this rejection.

■ Despite the fact that defendant was found to have been under the influence of cocaine and alcohol at the time of his crimes, the only evidence suggesting that he could not conform his conduct to legal requirements came in the form of a psychiatrist's written report based on a single two-hour interview. The same report was the basis for defendant's claims of organic brain syndrome and susceptibility to rehabilitation. As the trial judge observed, however, the physician primarily relied on what he was told by defendant during that single session, some of which was contradicted by defendant's conduct during the commission of these crimes, as well as by his testimony at trial. There was no independent testing, nor any meaningful information obtained from other sources. Neither was there corroborative evidence that defendant's actions were directly caused by his intoxication. We agree with the trial judge's conclusion that these mitigating factors were not established by a preponderance of the evidence.

■ Defendant's claims that he was a minor participant and that he could not have foreseen the victim's death are unconvincing and contrary to the overwhelming weight of the evidence.

■ Finally, the court's alleged failure to sufficiently consider the felony-murder instruction is not error. Such an instruction may be considered mitigating only when there is some doubt as to whether the defen-

dant intended to kill the victim. *State v. Atwood*, 171 Ariz. 576, 648–49, 832 P.2d 593, 665–66 (1992), *cert. denied*, 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993). There is no reasonable doubt here that defendant intended Anderson's death. He planned it, discussed it, and participated in its execution.

In the same vein, defendant argues that the trial court erred in failing to make a specific finding pursuant to *Enmund v. Florida*, 458 U.S. 782, 801, 102 S.Ct. 3368, 3378–79, 73 L.Ed.2d 1140 (1982), that he killed, intended to kill, or attempted to kill the victim. The jury returned a general form of first degree murder verdict, without indicating whether it found premeditated murder, felony-murder, or accomplice liability. However, the trial court specifically found, in that part of its special verdict concerning statutory mitigating circumstances, that "[t]he defendant intended to kill the victim." Although the court did not state that this finding was made beyond a reasonable doubt, the record clearly supports such a conclusion.

When a jury is instructed on felony-murder and finds the defendant guilty of first degree murder, the trial court must make an *Enmund* finding of the requisite degree of culpability beyond a reasonable doubt. *State v. McDaniel*, 136 Ariz. 188, 199, 665 P.2d 70, 81 (1983). However, we have accepted *Enmund* findings that were not specifically labeled as having been made "beyond a reasonable doubt." *See State v. McCall*, 160 Ariz. 119, 126, 770 P.2d 1165, 1172 (1989), *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3289, 111 L.Ed.2d 798 (1990) (finding of intent to kill sufficient when made in the context of rejecting a proffered mitigating factor); *Martinez–Villareal*, 145 Ariz. at 450, 702 P.2d at 679 (finding of intent to kill in sentencing met required degree of proof where independent review of record supported a finding of beyond a reasonable doubt). Form will not be permitted to triumph over substance. There is no magic in the words used so long as it is apparent that the trial court has applied a correct standard.

Here, the court cited defendant's admission of involvement in the killing to a defense expert retained for mitigation purposes, the evidence of his attempts to kill the victim by asphyxiation and manual strangulation, the fact that he held the victim down for Karen Thompson's fatal blow, and his admission to the psychiatrist that he could have stopped Thompson from killing the victim but did not. This evidence, coupled with all of the testimony about the planning of the crime, supports a finding beyond a reasonable doubt that defendant intended to kill the victim.

## DISPOSITION

Our independent reweighing of aggravating and mitigating circumstances leads us to affirm the death sentence. The victim, a good samaritan who agreed to give two people a ride, undoubtedly spent many terrified hours leading up to and including his brutal killing. His mental and physical anguish cannot be ignored. This, coupled with the pecuniary gain motive and defendant's prior conviction, causes us to conclude that the proffered mitigation was not sufficiently substantial to call for leniency.

## NON–CAPITAL SENTENCING ISSUES

Defendant argues that the trial court erred in enhancing his kidnapping sentence to a maximum aggravated term of 21 years upon finding that the offense was of a "dangerous nature," pursuant to Laws 1977, ch. 142, § 48 (as amended) (former A.R.S. §§ 13–604(G), (K)). We agree because the dangerous nature of the felony was not separately alleged and proved.

A.R.S. § 13–604(K) formerly provided that " 'dangerous nature of the felony' means a felony involving the use or exhibition of a deadly weapon or dangerous instrument or the intentional or knowing infliction of serious physical injury upon another." Dangerousness as defined in this subsection must be alleged in the indictment and be the subject of a jury finding in order to be used as a sentence enhancer, unless an element of the offense requires proof of dangerousness. *State v. Parker*, 128 Ariz. 97, 99, 624 P.2d 294, 296 (1981); *see* former A.R.S. § 13–604(K).

The indictment in this case asserted that defendant restrained the victim "with the intent to inflict death or physical injury ... *or otherwise to aid in the commission of a felony."* (Emphasis added). Therefore, *the offense as alleged did not necessarily require proof of dangerousness,* nor was there a jury finding in this regard. Because the trial judge sentenced defendant to the maximum aggravated sentence for dangerous kidnapping, we reduce his sentence to the maximum for kidnapping, 14 years imprisonment. *See* A.R.S. §§ 13–701(C)(1), –702(B).

Defendant further argues that the trial court erred in sentencing him to consecutive sentences on the charges of theft of credit cards, theft (of an automobile), and armed robbery, thus violating the double jeopardy clauses of the Fifth Amendment of the United States Constitution and Article 2, Section 10 of the Arizona Constitution.

We conclude that the sentences for armed robbery and theft of the automobile must be served concurrently, but the sentence for theft of credit cards may be served consecutively to the others. A.R.S. § 13–116 provides, in part, that "[a]n act or omission which is made punishable in different ways by different sections of the laws may be punished under both, but in no event may the sentences be other than concurrent." The statute thus precludes the imposition of consecutive sentences for two offenses that are really a "single act." *State v. Gordon,* 161 Ariz. 308, 312, 778 P.2d 1204, 1208 (1989). Conduct amounts to a single act if, after eliminating the evidence supporting the charge "that is at the essence of the factual nexus and will often be the most serious of the charges," the remaining evidence is insufficient to support the elements of the additional charge. *Id.* at 315, 778 P.2d at 1211.

The armed robbery took place when defendant obtained control of the victim's car by telling him that he had a gun. The theft of the automobile took place at the same time and as a result of the same conduct. The theft of the credit cards occurred after the group arrived in Chandler, when the defendant and Thompson took Anderson's wallet. As the state concedes, after eliminating the evidence necessary to support the armed robbery charge, the remaining evidence is insufficient to support the charge of automobile theft, so those two sentences must be served concurrently. The charge of credit card theft, however, was supported by evidence that was not necessary to support the charge of armed robbery, and the sentence for that charge may be served consecutively to the other two charges.

## CONCLUSION

The convictions in this capital case were appealed, briefed, and argued before the repeal of A.R.S. § 13–4035. *See* 1995 Laws, Ch. 198, § 1; *State v. Kemp,* 185 Ariz. 52, 67, 912 P.2d 1281, 1296 (1996). We have reviewed the record for fundamental error and have found none. Except as previously indicated, we affirm the defendant's convictions and sentences.

FELDMAN, C.J., MOELLER and MARTONE, JJ., and ROBERT J. CORCORAN, Justice (Retired), concur.