NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

SERGIO DAVID RIVERA, SR., *Appellant.*

No. 1 CA-CR 14-0048
FILED 10-01-2015

Appeal from the Superior Court in Maricopa County
No.  CR2013-000414-001
The Honorable Jeanne M. Garcia, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Craig W. Soland
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Mikel Steinfeld
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

---

Presiding Judge Maurice Portley delivered the decision of the Court, in which Judge John C. Gemmill and Judge Michael J. Brown joined.

---

**P O R T L E Y**, Judge:

**¶1**        Defendant Sergio David Rivera was indicted, tried, convicted, and sentenced on three counts of sexual abuse of a minor, two counts of molestation of a child, five counts of sexual conduct with a minor, two counts of furnishing obscene or harmful items to minors, all involving his conduct with an 11-year-old daughter, V., between June 2009 and December 2010;[1] and ten counts of sexual exploitation of a minor, for knowingly possessing child pornography in December 2010.[2]  He argues that the trial court erred by denying his motion for mistrial based on juror misconduct, by instructing the jury on  reasonable doubt pursuant to *State v. Portillo*, 182 Ariz. 592, 898 P.2d 970 (1995), and he was deprived of a fair trial because of prosecutorial misconduct.  For the following reasons, we affirm.

**DISCUSSION**

**A.  Motion for Mistrial**

**¶2**        During his second trial on the charges,[3] the trial court notified the parties that Juror 14 had informed the bailiff that "during the lunchtime, . . . [Juror] number 9 told [Juror] number 14 that number 9's wife knows about this case, about the content of it and she described it as a horrible case."  According to Juror 14, other jurors were present at the time, but she did not know if anyone else heard the comment from Juror 9.  The bailiff reported that Juror 14 "wasn't sure" if Juror 9's wife worked at the

---

[1] We view the evidence in the light most favorable to sustaining the convictions and resolve all reasonable inferences against the defendant. *State v. Karr*, 221 Ariz. 319, 320, ¶ 2, 212 P.3d 11, 12 (App. 2008).
[2] Rivera was sentenced to consecutive multiple life sentences.
[3] The first jury was not able to reach a unanimous verdict and the trial court declared a mistrial.

court, if her friends worked there, or precisely how Juror 9's wife knew about the case.

¶3         At the next recess, the court and the parties spoke with Juror 14 separately and out of the presence of the other jurors. Juror 14 explained that several jurors had gone to lunch together the previous day, and the following conversation occurred with Juror 9:

> [Juror 9] made a comment directly to me to say that his wife knew everything about the trial. I was surprised and said really, did you tell her anything about the trial and he said, no, that his wife, either his wife works for the court system or her friends work with the court system. When he told her the trial name she knew everything about the trial and said oh, that's a bad trial. I didn't ask him if they had discussions about evidence or anything like that. I assumed that they were having discussions, but obviously knowing that she knew about the trial and the content of it that there's an opportunity there that they could be discussing it and he may not be impartial if there's discussion.

Juror 14 also advised the court that the conversation was just between her and Juror 9, even though Jurors 2, 8, 5, and 15 were also at the table. She noted that there were people sitting next to them who "could have overheard." Upon further questioning by the court, Juror 14 avowed that she felt she could still be fair and impartial.

¶4         The court then called in Juror 9 and asked if he had heard anyone talk about the case or if he had talked about it. Juror 9 replied, "nothing factual about the case . . . no, not case related." When the trial court specifically asked, "[s]o you have not heard anyone else talk about the case and you haven't talked about the case either," Juror 9 replied, "No, nothing having to do with the case."

¶5         The court and the parties then spoke individually with the other jurors who had been at the table. Jurors 5, 8, and 15 each informed the court that she or he had not heard anyone talking about the case at lunch. All three professed their ability to remain fair and impartial jurors. Only Juror 2 responded that she had heard that "somebody's wife works in the courthouse" and that "they said she knows the details of the case because her friends work in the courthouse and she works in the courthouse." Juror 2 stated, "I was taken aback but nothing else." In response to additional questions, she identified Juror 9 as the person she

heard make the remark during lunch the day before.  She also stated that Juror 9 made no comment that indicated that his wife's knowledge influenced him in any way, did not "express" that he talked to his wife about the case, and did not say anything about his wife "sharing information" with him or he sharing information with her.  She also stated that nobody asked him about his comments "because we didn't want to know" and [Juror 9] "didn't say anything else."  Juror 2 avowed that what she heard had not affected her judgment "in any way."

¶6         The court then recalled Juror 9 and confronted him with the information that several jurors had heard him comment at lunch "about your wife knowing something about this case."  Juror 9 replied, "[t]hat's true."  When the court asked Juror 9 to tell the court what he had said, Juror 9 stated:

> Sure.  I said that we've talked about not talking about the case and I said it's difficult for me not to talk about it because my wife knows about this case but we can't talk about it.  That was the comment I made.

When the trial court asked him to explain how he learned that his wife knew about the case, Juror 9 replied:

> All her friends work down here at the courthouse.  When I brought the letter home that has the name of the case on it she said I know that case[,] but we haven't discussed it.

Juror 9 informed the court he did not know "what" his wife knew about the case "because we haven't talked about it."  When asked by the court if the fact that his wife had information about the case was "impacting [his] ability to sit as a fair and impartial juror," he responded, "[i]t would perhaps if she had shared those details with me, but she hasn't."

¶7         After Juror 9 left the room, Rivera's counsel moved for a mistrial, arguing that the fact that Juror 9 was privy to "outside communication," and that other jurors were aware of that, tainted the jury panel.  According to counsel, no "remedy short of a mistrial" existed because so many jurors had "at least a possibility of overhearing" the comment that the problem could not be cured by simply designating some jurors as alternates.  The court indicated that it was "not inclined" to grant a mistrial, noting:

> I don't believe that we have hit the level where I'm concerned that even number 9 is not going to be fair and impartial. I don't believe that six of these jurors have seen or heard anything of concern. At most my worry is with number 9.

However, the court took the matter under advisement in order to review the case law before ruling.

¶8 The court denied the motion. In the written ruling, the court reviewed the responses of Juror 14 and the other jurors present at the lunch and concluded that "no other juror" who heard Juror 9's comments was influenced and that each of them could still be fair and impartial jurors. With regard to Juror 9, however, the trial court stated: "the court cannot definitively conclude that any communication Juror Number 9 had with his wife would influence his deliberations." However, the court determined that "in these circumstances, it is best to err on the side of caution and remove Juror Number 9, who previously indicated that he is not able to be present on November 14, when the jury may still be deliberating." The court then dismissed Juror 9, making it clear that the court was "not finding that [he] had any improper communication with [his] wife," but the "primary reason" was the conflict he had with the November 14 trial date.

¶9 Rivera now argues that the court's denial of his motion was an abuse of its discretion. He maintains that the court made two errors: (1) finding that Juror 9 had not committed misconduct; and (2) finding that the jurors who had been at lunch, specifically Juror 14, could still be fair and impartial.

¶10 We review a court's denial of a motion for mistrial for an abuse of discretion. *State v. Roque*, 213 Ariz. 193, 224, ¶ 131, 141 P.3d 368, 399 (2006). A motion for mistrial is the most dramatic remedy for trial error and is appropriate only when justice will be thwarted if the current jury is allowed to consider the case. *Id*. "We will only reverse a trial court's decision to deny a mistrial if a clear abuse of discretion is demonstrated." *State v. McCutcheon*, 162 Ariz. 54, 59, 781 P.2d 31, 36 (1989) (citation omitted).

¶11 "Juror misconduct warrants a new trial only if the defense shows actual prejudice or if *prejudice may be fairly presumed from the facts*." *State v. Davolt*, 207 Ariz. 191, 208, ¶ 58, 84 P.3d 456, 473 (2004) (internal citations and quotation marks omitted). "Trial courts have considerable discretion to determine whether juror misconduct requires a mistrial or other corrective action," and this court will not overturn a trial court's decision "absent a clear abuse of that discretion." *State v. Apodaca*, 166 Ariz.

274, 276-77, 801 P.2d 1177, 1179-80 (App. 1990). Further, when assessing juror misconduct, we accord great deference to the trial judge who held the evidentiary hearing and is in the best position to assess the effect, if any, of the extrinsic evidence. *See State v. Hall*, 204 Ariz. 442, 449, ¶ 23, 65 P.3d 90, 97 (2003). A trial court's denial of a mistrial will be reversed only if it is "palpably improper and clearly injurious." *State v. Murray*, 184 Ariz. 9, 35, 906 P.2d 542, 568 (1995) (quoting *State v. Walton*, 159 Ariz. 571, 581, 769 P.2d 1017, 1027 (1989)).

¶12 Rivera argues that the court erred in finding that Juror 9 did not commit misconduct. "In a criminal case, prejudice may be presumed from 'any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury.'" *Davolt*, 207 Ariz. at 208, ¶ 58, 84 P.3d at 473 (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)). There is, however, no indication in the record that Juror 9 discussed the facts of the case or had any private communications about the case with his wife. Juror 9 repeatedly denied any knowledge of what his wife may have heard or known about the details of the case, and Juror 2 and Juror 14 who heard Juror 9's comments confirmed his statements. The trial court clearly believed Juror 9 when explicitly finding that the juror had had no "improper communication" with his wife. In this we defer to the trial court. *See Pima Cty. Juv. Action No. 63212-2*, 129 Ariz. 371, 375, 631 P.2d 526, 530 (1981) ("The deference which appellate courts accord the trier of fact, whether judge or jury, to make determinations based on assessments of the credibility of witnesses is elementary.") However, and in an abundance of caution, the court removed Juror 9 from the jury panel before the jury began deliberating. As a result, Rivera cannot show that he was prejudiced by any misconduct on the part of Juror 9.

¶13 Jurors 5, 8, and 15, who were also at the lunch, avowed to the trial court that they did not hear Juror 9's comments. They also stated that they could continue to be fair and impartial. Again, the court clearly found them credible, and we defer to that finding. *Id.* Since they did not hear Juror 9's comment, Rivera cannot show actual prejudice, and we cannot "fairly presume" prejudice merely by their presence on the jury. *See State v. Nelson*, 229 Ariz. 180, 184, ¶ 12, 273 P.3d 632, 636 (2012) ("prejudice cannot be presumed without the requisite showing that the jury received and considered extrinsic evidence on the issues") (internal citation and quotation marks omitted).

¶14       The only extrinsic statement that Juror 14 and Juror 2 heard was that Juror 9's *wife* knew about the case through friends at the court and that it was a "bad" case. This statement did not give Juror 9, or any of the other jurors, any extrinsic evidence about the actual facts of the case and even the description of the case as "bad" is no revelation in light of the nature of the charges. Both Juror 14 and Juror 2 avowed that they could be fair and impartial. The trial court credited their statements, and we defer to the court's finding. *See Juv. Action No. 63212-2*, 129 Ariz. at 375, 631 P.2d at 530.

¶15       The trial court determined that the appropriate "corrective action" was to err on the side of caution and release Juror 9. The court determined that the remaining jurors had either not heard or were not affected by Juror 9's innocuous comment and that they were able to remain fair and impartial jurors. Given the absence of any evidence to the contrary, we find that the trial court acted well within its considerable discretion in determining that a mistrial was not warranted. *See Apodaca*, 166 Ariz. at 276-77, 801 P.2d at 1179-80.

### B. *Portillo* Instruction

¶16       Over Rivera's objection, the trial court instructed the jury on reasonable doubt pursuant to *Portillo,* 182 Ariz. at 596, 898 P.2d at 974. Rivera argued at trial, and now reiterates, that the instruction improperly reduces the State's burden of proof.

¶17       We review de novo whether a jury instruction accurately reflects the law. *State v. Cox*, 217 Ariz. 353, 356, ¶ 15, 174 P.3d 265, 268 (2007). In *Portillo*, our supreme court expressly directed the manner in which trial judges are to instruct juries in criminal cases concerning reasonable doubt. 182 Ariz. at 596, 898 P.2d at 974. Moreover, our supreme court has rejected challenges similar to Rivera's about *Portillo. See, e.g., State v. Forde*, 233 Ariz. 543, 565, ¶ 86, 315 P.3d 1200, 1222 (2014); *State v. Dann*, 220 Ariz. 351, 365, ¶ 65, 207 P.3d 604, 618 (2009); *State v. Ellison*, 213 Ariz. 116, 133, ¶ 63, 140 P.3d 899, 916 (2006). We are bound by the decisions of our supreme court and do not have the authority to either modify or disregard that court's rulings. *State v. Smyers,* 207 Ariz. 314, 318 n.4, 86 P.3d 370, 374 n.4 (2004). Because the *Portillo* instruction accurately reflects the law, the trial court properly gave the instruction.

### C. Prosecutorial Misconduct

¶18       Rivera claims that the prosecutor engaged in three forms of misconduct during the trial:   (1) when questioning prospective jurors

during voir dire; (2) when cross-examining Rivera; and (3) by vouching for the victim's truthfulness. He, however, concedes that he did not object to all of the instances he now alleges were misconduct.

**¶19**        We will separately review each instance of alleged prosecutorial misconduct, and our standard of review will depend upon whether Rivera objected to the alleged misconduct. *State v. Morris*, 215 Ariz. 324, 335, ¶ 47, 160 P.3d 203, 214 (2007). If an objection was made, we review for harmless error, but if there was no objection, then we only review for fundamental error. *State v. Gallardo*, 225 Ariz. 560, 568, ¶ 35, 242 P.3d 159, 167 (2010). "Error is harmless only if we can say, beyond a reasonable doubt, that it 'did not contribute to or affect the verdict.'" *State v. Green*, 200 Ariz. 496, 501, ¶ 21, 29 P.3d 271, 276 (2001) (quoting *State v. Bible*, 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993)). Fundamental error is "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial." *State v. Henderson*, 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2005) (internal citations and quotation marks omitted). A defendant has to establish that fundamental error exists and that the error in his case caused him prejudice. *Id*. at ¶ 20.

**¶20**        Prosecutorial misconduct is defined as conduct not merely the result of legal error, negligence, mistake, or insignificant impropriety, but conduct that, taken as a whole, amounts to intentional conduct that the prosecutor knows to be improper and prejudicial. *State v. Martinez*, 221 Ariz. 383, 393, ¶ 36, 212 P.3d 75, 85 (App. 2009) (citation omitted). "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. (internal citations and quotation marks omitted). Thus, even improper comments by a prosecutor will not warrant reversal of a defendant's convictions unless it is shown that there is a "reasonable likelihood" that the "misconduct could have affected the jury's verdict." *State v. Newell*, 212 Ariz. 389, 403, ¶ 67, 132 P.3d 833, 847 (2006) (internal citations and quotation marks omitted).

        (1) Voir Dire Questions

**¶21**        Prior to jury selection, the parties had a discussion in the judge's chambers and subsequently made a record of the discussion. Rivera's counsel started by stating that it had come to his attention that the victim and her younger brother had been adjudicated in the juvenile court system. He requested that the defense be allowed to impeach them as to

"the fact of the adjudication."  The trial court noted specifically that "the discussion in chambers was whether you wanted a ruling from me because the [S]tate or yourself might want to go into this as we question the jurors?"  Counsel replied, "Correct."  The court then granted counsel's impeachment request and also specified that "for purposes of discussing the issue with the jurors" the matter should be kept "at a minimum" and referred to only as an "adjudication" or a "juvenile court adjudication in New Mexico."

**¶22**        During the State's voir dire, the prosecutor questioned the jurors by informing them that they would "hear" that the victim and her brother "had a juvenile adjudication" or "got into some trouble with the juvenile court," and then asking whether that factor would affect "whether or not you found them believable in this case" or whether they would find them "less believable because of an unrelated juvenile case."  The prosecutor stated that they could consider that factor in weighing the credibility of the two witnesses, but asked whether anyone would "not believe their testimony straight off the bat because they got into some trouble?"  Rivera did not object to any of the questions.  On appeal, Rivera argues that the questions were improper "stakeout questions" that sought to obtain some sort of commitment from the jurors about the outcome of the case, and relies on our supreme court's decision in *State v. Prince*, 226 Ariz. 516, 250 P.3d 1145 (2011).

**¶23**        In *Prince*, our supreme court defined impermissible "stakeout questions" as questions that "ask a juror to speculate or precommit to how that juror might vote based on any particular facts."  226 Ariz. at 529, ¶ 35, 250 P.3d at 1158 (internal citations and quotation marks omitted).  The questions here did neither.  The questions simply sought to determine whether the jurors could keep an open mind when listening to and weighing the witnesses' testimony knowing the witnesses had gotten into some unrelated trouble with the law.  Contrary to Rivera's arguments, the prosecutor's questions were not "stakeout questions" because they did not "seek to precommit the juror[s] to a specific result."  *Id*.  The State's questions to the venire did not constitute misconduct, and was not error, let alone fundamental error.  *See State v. Lavers*, 168 Ariz. 376, 385, 814 P.2d 333, 342 (1991) (before we even engage in fundamental error review, this court must first find that the trial court committed some error).

(2) Cross Examination Questions

**¶24**        During the cross-examination of Rivera, the prosecutor challenged some of Rivera's responses to the questions.  In so doing, the prosecutor prefaced several of her follow up questions by stating, "I know

you want the jury to believe . . . *but* . . ."[4]  Rivera concedes that he did not object to any of these statements.  We thus limit our review to fundamental error.  *Henderson*, 210 Ariz. at 567, ¶ 19, 115 P.3d at 607.

**¶25**       Rivera argues that the repeated use of the phrase by the prosecutor constituted misconduct because it impermissibly inserted argument into the examination.  In support of his argument, he relies on *State v. Bolton*, where our supreme court found that the prosecutor's statements, "And you expect the jury to believe this story, Mr. Bolton" and "Stranger things have happened.  You bet, Mr. Bolton," may have been "argumentative."    182 Ariz. 290, 307-08, 896 P.2d 830, 847-48 (1995).  Although argumentative, the court found that the "misconduct was not so egregious that it permeated the entire trial and probably affected the outcome."  *Id*. at 308, 896 P.2d at 848.  We find the same to be true here.  While it would be prudent for the State to avoid the use of such pointed language, the statements were brief and made on one single day in a multiple day trial.  As such, the questions did not so permeate the entire trial as to affect its probable outcome.  *See id*.  Further, Rivera has failed to establish how the alleged misconduct caused him prejudice.  *Henderson*, 210 Ariz. at 567, ¶ 20, 115 P.3d at 607.  Consequently, even assuming the

---

[4] One example occurred during the following exchange:

> **Prosecutor**:  You don't think about this case?
> **Defendant**:  It's harsh accusations but I didn't think about it like I know I didn't do it.  I didn't really think about.
> **Prosecutor**:  *I know you want the jury to believe you didn't do this, but that's not what I asked you*.  You've read the police reports in this case.  You said the defense attorney gave them to you?
> **Defendant**:  Yes.
> **Prosecutor**:  And have you had any access to other materials, doctor's reports, transcripts of other hearings, things like that?
> **Defendant**:  Yes, I have.
> **Prosecutor**:  Including transcripts of your prior interviews or police reports about your prior interviews?
> **Defendant**:  Yes.
> **Prosecutor**:  So you've had a chance to read over everything that you've said in the past; is that right?
> **Defendant**:  Yes.

comments constitute misconduct, they do not constitute fundamental reversible error in this case.

(3) Vouching for Victim's Truthfulness

**¶26**      Rivera also claims the prosecutor engaged in impermissible vouching for the truthfulness of the victim.  He contends there were three instances: (1) direct examination of the victim; (2) during the redirect examination of the victim; and (3) there was vouching during closing arguments.  Rivera acknowledges that he only objected to the alleged instance that occurred during redirect examination of the victim.  We review that instance alone for harmless error. *Gallardo*, 225 Ariz. at 568, ¶ 35, 242 P.3d at 167.  The remaining instances are subject to fundamental error review. *Henderson*, 210 Ariz. at 567, ¶ 19, 115 P.3d at 607.

**¶27**      Two forms of impermissible vouching exist: the first occurs when the prosecutor places the prestige of the government behind its witness; and the second occurs when the prosecutor suggests that information not presented to the jury supports a witness's testimony. *State v. Doerr*, 193 Ariz. 56, 62, ¶ 24, 969 P.2d 1168, 1174 (1998) (citation omitted).  The first type of vouching consists of personal assurances of a witness's truthfulness; the second involves prosecutorial remarks that bolster a witness's credibility by references to material outside the record. *State v. Dunlap*, 187 Ariz. 441, 462, 930 P.2d 518, 539 (App. 1996) (citing *State v. King*, 180 Ariz. 268, 277, 883 P.2d 1024, 1033 (1994)).

**¶28**      On the second day of the victim's direct testimony, the trial court received and read a note from a juror to the lawyers.  The note stated:

> If [the victim] testifies today would it be possible to ask her to
> not hide her face.  It is difficult to assess her truthfulness when
> I can't see her expressions.  Thank you in advance.

The court asked the prosecutor to "make that request of the witness if you deem it appropriate."  Then in response to the note, and when direct examination resumed, the prosecutor told the victim that she first wanted "to talk a little bit about how you testified yesterday."  The prosecutor stated, "Some people noticed when you testified you had your hand up sometimes and your hair was covering part of your face."  The following exchange then occurred:

Q. Why did you do that?

A. I don't know. I just was sad, I guess.

Q. Is it because you were being untruthful?

A. No.

Q. Is this stuff embarrassing to talk about?

A. Yes.

Q. Does it help sometimes to talk about it if you're not looking at anybody?

A. Yes.

¶29      Rivera maintains that the question "is it because you were being untruthful," constituted the prosecutor's "personal assurance" of the veracity of the victim. The argument is without merit. The prosecutor's question provided no "assurance" of the victim's veracity; it simply addressed the juror's question and afforded the victim an opportunity to explain her reasons for hiding her face while testifying the previous day. The prosecutor committed no misconduct by asking the question.

¶30      During cross-examination, Rivera's counsel elicited the fact that the victim had a juvenile adjudication and suggested, through his questions, that the victim was making up the allegations against her father because he was the disciplinarian in the family, he disapproved of her friends, and would not let her "hang out" with them. Counsel also suggested that the victim made up the allegations to win the attention and support of her mother. On redirect examination, the prosecutor asked the victim, "When you talked to this jury and told them what your dad did to you *did you make any of that up*?" The victim replied, "No." Rivera's counsel "object[ed] to the vouching," but the trial court overruled the objection and let the answer stand. The prosecutor then went on to ask the victim if she had made up the allegations to get attention, including the attention of her mother, which the victim denied.

¶31      Rivera renews his argument that these redirect questions amounted to improper vouching. However, the questions did not place the prestige of the government behind the victim or suggest any personal assurances by the prosecutor of the victim's veracity. The questions were the result of the cross-examination questions and simply permitted the

victim to address the suggestion that she was lying because she was unhappy with her father and wanted to get her mother's support. We conclude the court did not abuse its discretion in overruling the objection. *See State v. Amaya-Ruiz*, 166 Ariz. 152, 167, 800 P.2d 1260, 1275 (1990) (explaining we will not reverse a trial court's rulings on issues of relevance and admissibility of evidence absent a clear abuse of discretion).

¶32　　　　Finally, Rivera claims that the prosecutor committed several instances of improper vouching during her closing and rebuttal arguments. Our review is limited to fundamental, prejudicial review because Rivera did not object to the statements during the State's closing arguments. *Henderson*, 210 Ariz. at 567, ¶ 19, 115 P.3d at 607.

¶33　　　　Rivera challenges the prosecutor's statement during her closing argument that:

> *They came in and they told you the truth.* These are little kids. What motive do they have to come and lie to all of you. (Emphasis added.)

Rivera also points to the prosecutor's rebuttal argument, where she stated:

> [The victim] took the testimony, the embarrassment, being ashamed *because she wanted to come in and tell the truth about what her dad did to her. It would have been easy for her to just call up my office and say you know what, I don't want to do this. I lied, didn't happen. She did not do that.* She did not do that once, not to police, not to my office, to no one. If the goal was to get the defendant out of the house, done. When he moved back in 2011, hey, [detective], my dad is back, come and get him. That didn't happen. What about now, what would [the victim's] motivation be to come back from [New Mexico] and testify? He's out of the house. He's not living with them now.
>
> There was also the argument made that [the mother] was jealous of [the victim], so [the mother] had [the victim] make it up. If you don't believe the other two versions of that story maybe [the mother] was jealous and concocted that whole thing. That's the conspiracy theory. We waited for it. If this is a conspiracy it was the worst conspiracy ever. Somebody would have seen the defendant looking at child pornography on the computer other than [the victim]. Somebody would have seen the defendant's penis in [the victim's] vagina or his hands on her breasts. *That didn't happen because these witnesses*

*are coming in and telling the truth.  They're telling you what
happened.  They're not embellishing it.  They're not trying to make
it better for themselves.*  If they were they did a terrible job.
(Emphasis added.)

Rivera contends that, with each of the highlighted phrases, the prosecutor
was giving "personal assurances of the veracity of the State's witnesses."
Rivera also contends that the prosecutor alluded to "matters outside the
record" with her statement that the victim did not call her office to tell the
prosecutor she was lying.

**¶34**        "Wide latitude is given in closing arguments and counsel may
comment on the evidence and argue all reasonable inferences therefrom."
*Amaya-Ruiz*, 166 Ariz. at 171, 800 P.2d at 1279 (internal citations and
quotation marks omitted).  If a prosecutor's characterization of a witness as
truthful is "sufficiently linked to the evidence," it has not been deemed to
be vouching even if, out of context, it might be interpreted as such.  *State v.
Corona*, 188 Ariz. 85, 91, 932 P.2d 1356, 1362 (App. 1997); *see also State v. Lee*,
185 Ariz. 549, 554, 917 P.2d 692, 697 (1996) ("she's been, I think, honest" and
"I think he was an honest man" not improper vouching in context of overall
closing argument).

**¶35**        When viewed in context, the challenged statements are not
vouching that requires reversal of the convictions.  But even if we assume
that the statement that "it would have been easy for the victim to call and
say I don't want to do this," and its inference, was outside any evidence
presented at trial, the prosecutor was trying to argue, even if inartfully, why
the jury should believe the victim in light of the defense's suggestions that
the victim had improper motives and was lying.  At best, any error in
making the statement is harmless given the other evidence in the record.
And the statement is also tempered by the jury instructions, which included
(1) the instruction that what the lawyers say is not evidence, and (2) the
instruction that the jury had to independently weigh the testimony and
evidence to determine the facts and determine whether the State proved
each and every element of each charge beyond a reasonable doubt.
Consequently, although counsel has wide latitude in closing argument,
portions of the prosecutor's argument may have constituted error, but any
error here is harmless and does not amount to prosecutorial misconduct
that is fundamental, prejudicial error warranting reversal.

## CONCLUSION

¶**36**      Based on the foregoing, we affirm Rivera's convictions and sentences.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama