27 P.3d 325

STATE of Arizona, Appellant,

v.

Michael WEEKLEY (A), John Herman Jansen (B), Appellees.

No. 1 CA–CR 99–0897.

Court of Appeals of Arizona, Division 1, Department D.

June 5, 2001.

manufacture of dangerous drugs and one count of possession of equipment and/or chemicals for the purpose of manufacturing dangerous drugs. The state also charged Weekley with an additional count of possession of methamphetamine for sale. Both defendants moved to suppress all evidence seized by Phoenix police officers following a search of a hotel room they jointly occupied. Defendants likewise sought to suppress evidence seized from their persons, from Weekley's backpack and vehicle, and from a storage unit rented in Weekley's name.

¶ 2 The trial court granted defendants' motions to suppress in their entirety, and the state filed a timely notice of appeal. We have jurisdiction pursuant to Arizona Revised Statutes Annotated (A.R.S.) §§ 13–4031 and 13–4032(6). For the reasons that follow, we reverse the trial court's suppression order and remand for further proceedings consistent with this decision.

### FACTS

¶ 3 In reviewing the trial court's suppression order, we may consider only the testimony presented at the suppression hearing. *See State v. Flower*, 161 Ariz. 283, 286 n. 1, 778 P.2d 1179, 1182 n. 1 (1989). We view that evidence in the light most favorable to sustaining the trial court's ruling. *State v. Moore*, 183 Ariz. 183, 186, 901 P.2d 1213, 1216 (App.1995).

¶ 4 On January 12, 1999, Jansen rented a room for himself and Weekley at a hotel in Phoenix. He rented the room for one night and paid the hotel's assistant manager in cash. He also allowed the manager to take an imprint of his credit card. He indicated on the registration card that he would be parking a Nissan Maxima in the hotel's parking lot. The following day, Jansen extended his rental of the room until January 19.

¶ 5 The hotel's housekeeping staff eventually became concerned because defendants repeatedly refused maid service and twice requested that housekeeping bring a vacuum cleaner to their room late in the evening. On January 15, the housekeeping supervisor, B.P., expressed these concerns to the assis-

Janet Napolitano, Attorney General, by Randall M. Howe, Chief Counsel, Criminal Appeals Section, and Robert A. Walsh, Assistant Attorney General, Phoenix, Attorneys for Appellant.

James J. Haas, Maricopa County Public Defender, by Paul J. Prato, Deputy Public Defender, Phoenix, Attorneys for Appellee Jansen.

Kerrie M. Droban, Cave Creek, Attorney for Appellee Weekley.

### OPINION

THOMPSON, Judge.

¶ 1 The state charged Michael Weekley and John Herman Jansen with one count of

tant manager, G.I. B.P. indicated that she wanted to enter the room to check for possible damage. G.I. agreed to inspect the room with B.P. as soon as his schedule permitted.

¶ 6 On January 19, the last day for which Jansen had reserved the room, G.I. and B.P. met to conduct their inspection. They arrived at the room some time between 10:00 and 11:00 a.m. and discovered that someone had placed a sign on the doorknob requesting housekeeping services. Upon entering the room, they observed "lots of boxes" containing empty vials, beakers, and prescription medication bottles in plain view. G.I. opened the doors of the television cabinet and discovered what he believed to be chemicals stored in various jars and containers. The label of one of the jars indicated that it contained sodium cyanide. G.I. also discovered a bottle containing an unidentified liquid in the room's refrigerator. In addition, G.I. and B.P. found a plastic plate, covered with a burnt, powdery substance, sitting on the bathroom counter.

¶ 7 Believing that they had discovered a "drug lab," G.I. and B.P. requested that the employee working the front desk call 9–1–1. The two then remained in the room for as long as twenty minutes while they waited for the police to arrive. Eventually, they left the room to return to the front office to await the police. Before leaving, however, G.I. re-keyed the door's electronic lock to prevent the defendants from entering the room.

¶ 8 Phoenix police officer Alvin Jackson arrived at the hotel at approximately 11:40 a.m. G.I. immediately took Jackson to the room to show him what he and B.P. had discovered. Jackson remained in the room for approximately one to two minutes while G.I. showed him the items he and B.P. had found. Jackson then returned with G.I. to the hotel's office.

¶ 9 Approximately five minutes later, Phoenix police officer Rick Massey arrived at the hotel. Officer Jackson apprised Massey of the situation and both officers then moved their patrol cars approximately one block from the hotel so as not to alert the defendants in the event they returned to the hotel. Shortly after noon, G.I. accompanied Massey and Jackson to the room. While there, Massey wrote down the names of the chemicals in the labeled bottles. The officers did not move anything while in the room, nor did they search areas of the room not previously searched by G.I. and B.P.

¶ 10 The officers left the room and returned to the hotel office by 12:16 p.m., at which time Weekley approached the front desk to inquire as to why his electronic key was not working. The officers arrested Weekley. Moments later, they arrested Jansen, who was waiting by the hotel room door.

¶ 11 Additional law enforcement officers subsequently arrived at the hotel and entered defendants' room. Phoenix firefighters also responded to the scene to determine whether the air in the hotel room was safe to breathe. The police eventually seized the chemicals and other drug-related items discovered in the room.

¶ 12 At no time did the police attempt to obtain a warrant to permit them to search defendants' hotel room or to seize the items found there. Moreover, several hours after defendants' arrests, officers conducted a warrantless search of Weekley's vehicle in the hotel parking lot. They obtained keys to the vehicle while searching Weekley subsequent to his arrest. In the vehicle, the officer discovered a copy of a rental agreement to a storage unit facility. The rental agreement was in Weekley's name. A search warrant was obtained for the storage unit and methamphetamine and additional chemicals were found there.

## PROCEDURAL HISTORY

¶ 13 Following a hearing on defendants' motion to suppress, the trial court issued an order suppressing all evidence seized from the hotel room, from defendants' persons, from Weekley's vehicle, and from the storage unit. The court found that the police had engaged in a warrantless search of the hotel room without defendants' consent. It further found that the hotel's employees lacked authority to consent to the search.

¶ 14 The court reasoned that exigent circumstances provided the only possible justification for the warrantless search. However, it rejected the state's argument that the volatile nature of the chemicals discovered in defendants' hotel room gave rise to an emergency situation which required the police to

act quickly to insure the safety of both the public and the police:

> The immediate police reaction was surveillance rather than any emergency actions to protect life or property. Officers remained in the room or immediate area even after determining the danger involved with some of the disclosed materials. Police conduct belies their statements [that] they were reacting to exigent circumstances in conducting a warrantless search.

The court concluded that the unlawful search of defendants' hotel room tainted all evidence subsequently seized by the police.

## DISCUSSION

¶ 15 The state's appeal challenges the trial court's suppression order on two grounds. The state argues first that G.I. and B.P. had authority to consent to the police officers' subsequent search of the hotel room. The state argues in the alternative that the officers' warrantless entry into the hotel room did not constitute "searches" for purposes of the Fourth Amendment because none of those searches exceeded the scope of the initial private search conducted by G.I. and B.P. As we explain below, we find the second argument advanced by the state to be dispositive of the police searches prior to noon and the first argument dispositive of the police search and seizure after the noon checkout deadline.[1]

## I. THE HOTEL EMPLOYEES' SEARCH OF DEFENDANTS' ROOM CONSTITUTED PRIVATE, RATHER THAN STATE, ACTION AND THUS DID NOT IMPLICATE THE FOURTH AMENDMENT. BECAUSE THE SUBSEQUENT ENTRIES INTO THE ROOM BY OFFICERS JACKSON AND MASSEY DID NOT EXCEED THE SCOPE OF THE HOTEL EMPLOYEES' INITIAL PRIVATE SEARCH, THOSE ENTRIES LIKEWISE DID NOT CONSTITUTE FOURTH AMENDMENT "SEARCHES."

¶ 16 The Fourth Amendment prohibits the government, either directly or through its agents, from engaging in unreasonable searches and seizures. *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). The Fourth Amendment's proscription against unreasonable searches and seizures, however, "is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.' " *Id.* (quoting *Walter v. United States,* 447 U.S. 649, 662, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980) (Blackmun, J., dissenting)); *see also Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921) (wrongful search or seizure conducted by private party does not violate Fourth Amendment). Clearly, a private search may invade a person's reasonable expectation of privacy. Nevertheless, if that invasion of privacy is purely the result of non-governmental action, "[o]nce frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental" use of the information obtained. *See id.* at 117, 104 S.Ct. 1652.

> The Fourth Amendment is implicated only if the authorities [obtain] information with respect to which the expectation of privacy has not already been frustrated. In such a case the authorities have not relied on what is in effect a private search, and therefore presumptively violate the Fourth Amendment if they act without a warrant.

*Id.* at 117–18, 104 S.Ct. 1652. Thus, in a private search case, the legality of later governmental intrusions "must be tested by the degree to which they exceeded the scope of the private search." *Id.* at 115, 104 S.Ct. 1652; *see also Walter,* 447 U.S. at 657, 100 S.Ct. 2395.

¶ 17 The Supreme Court's decision in *Jacobsen* involved a freight carrier's private search of a package containing cocaine. 466 U.S. at 111, 104 S.Ct. 1652. The Supreme Court has not addressed whether the "beyond-the-scope-of-the-private-search" test

---

1. The state's brief does not address the argument that exigent circumstances justified a warrantless search of defendants' hotel room. The state thus has abandoned that argument for purposes of appeal. *See State v. McCall,* 139 Ariz. 147, 163, 677 P.2d 920, 926 (1983).

would apply when what is searched is an entire dwelling, as opposed to a package, envelope or container. One federal appellate court has refused to expand *Jacobsen* to encompass such a situation. *See United States v. Allen*, 106 F.3d 695, 699 (6th Cir.) (refusing to apply *Jacobsen* analysis to search of motel room). Other circuit courts of appeal, however, have found the reasoning of *Jacobsen* applicable to residential searches. *See United States v. Miller*, 152 F.3d 813, 815–16 (8th Cir.1998) (holding that police search of defendant's efficiency apartment at halfway house did not implicate Fourth Amendment because it did not exceed prior search conducted by employees of the halfway house); *United States v. Paige*, 136 F.3d 1012 (5th Cir.1998) (holding that police search of defendant's attic did not implicate Fourth Amendment because it followed and did not exceed a private search that was reasonably foreseeable to the defendant). The Fifth Circuit Court of Appeals found in *Paige* that a relevant factor in determining whether a governmental search of a residence subsequent to a private search implicates the Fourth Amendment is whether the initial private invasion of privacy was reasonably foreseeable to the defendant:

> [W]e find that the proper Fourth Amendment inquiry, when confronted with a police search of a home that extends no further than a previously-conducted private party search, is to determine whether the homeowner or occupant continues to possess a reasonable expectation of privacy after the private search occurs. In making this determination, consideration must be given to whether the activities of the home's occupants or the circumstances within the home at the time of the private search created a risk of intrusion by the private party that was reasonably foreseeable. If indeed the private party's intrusion was reasonably foreseeable (based on such activities or circumstances), the occupant will no longer possess a reasonable expectation of privacy in the area or thing searched, and the subsequent police search *will not* trigger the Fourth Amendment. If, however, the private party's initial intrusion was not reasonably foreseeable, the occupant's reasonable expectation of privacy will survive, and the subsequent police search *will* indeed activate the Fourth Amendment.

*Paige*, 136 F.3d at 1020 (emphasis in original).

¶ 18 We find the reasoning of *Miller* and *Paige* persuasive. The Fourth Amendment is designed to protect *reasonable* expectations of privacy. Here, the defendants left extensive evidence of obvious drug-related activity in their hotel room and then placed a sign on the door requesting housekeeping service. At the very least, once the defendants placed the sign on the door, they could reasonably have foreseen that an employee of the hotel would enter the room, particularly when invited by the sign, and observe the drug-related chemicals and equipment present there.

¶ 19 The evidence further reveals that, when the hotel employees entered the defendants' room, they were not acting as agents of the government. Rather, they were motivated by their private concern, brought on by the defendants' repeated refusal to accept housekeeping services, that the defendants might have damaged the hotel's property. The record in this case thus establishes that G.I. and B.P.'s initial entry into the room was a private search that was reasonably foreseeable to defendants.

¶ 20 It follows, then, that the subsequent entries into the room by Officers Jackson and Massey constituted "searches" for purposes of the Fourth Amendment only if the officers engaged in an exploration of the room that exceeded the scope of the initial search conducted by G.I. and B.P. Nothing in the record, however, suggests that this occurred. G.I. testified that, in addition to examining the items in plain view, he and B.P. opened the television cabinet and the refrigerator during the approximately twenty minutes they remained in the hotel room. In contrast, Officer Jackson's initial entry into the room lasted only one to two minutes and consisted of a brief viewing of the items already discovered by the hotel employees.

¶ 21 Jackson's and Massey's subsequent entry into the room likewise remained within the scope of the initial private search. The

officers apparently spent less than ten minutes in the room. During that time, G.I. showed Officer Jackson the plastic plate bearing the burnt, powdery substance. G.I. had discovered the plate during his initial search of the room, but apparently had failed to show it to Jackson during Jackson's first entry into the room. Officer Massey wrote down the names of the chemicals in the labeled bottles.

¶ 22 On this record, we are convinced that the first and second entries into the hotel room by Officers Jackson and Massey did not constitute "searches" within the meaning of the Fourth Amendment because the defendants could reasonably have foreseen that hotel employees would enter the room in response to the sign requesting housekeeping service and because the police officers' activities while in the room did not exceed the scope of the private search conducted by G.I. and B.P.

## II. ONCE THE HOTEL TERMINATED THE DEFENDANTS' STAY AFTER THE EXPIRATION OF THE RENTAL PERIOD AND IN RESPONSE TO THE DISCOVERY OF DANGEROUS CHEMICALS, HOTEL MANAGEMENT HAD THE AUTHORITY TO CONSENT TO THE SEARCH OF THE ROOM AND TO THE SEIZURE OF THE ITEMS DISCOVERED THERE.

¶ 23 Jansen's rental agreement with the hotel was due to expire at 12:00 p.m. on January 19, the day G.I. and B.P. conducted their search of the defendants' room. Upon discovering the chemicals, vials and other equipment in the defendants' hotel room, G.I. re-keyed the electronic lock to the door to prevent the defendants from entering. This event occurred before noon. Officer Jackson's initial entry into the hotel room likewise occurred before noon. All subsequent entries, however, occurred after the noon checkout deadline.

¶ 24 The trial court rejected the state's argument that G.I. effectively terminated the hotel's rental agreement with Jansen when he re-keyed the door and that the hotel management thereafter had actual authority to consent to a search of the defendants' room:

> The case law is legion that an invited guest has an expectation of privacy under our fact circumstances. The Defendants were not aware of any termination of the rental by the hotel, and the Defendants retained their rights to privacy until noon of the day of the search or within a reasonable time thereafter, based on the history of the rental agreement and general hotel policy.

¶ 25 The state challenges this ruling on appeal, arguing that, despite the fact that Jansen's rental agreement had not yet expired when G.I. re-keyed the lock, the hotel nevertheless had the right to terminate the rental agreement once hotel employees discovered a possible methamphetamine lab in the defendants' room. We have already held that the initial police entries into the defendants' room did not constitute "searches" within the meaning of the Fourth Amendment. The evidence in this case reveals that the only Fourth Amendment searches of the hotel room by the Phoenix police occurred after 12:00 p.m. By that time, Jansen's rental agreement with the hotel had lapsed. Nothing in the record suggests that Jansen had a reasonable expectation "based on the history of the rental agreement and general hotel policy" that his tenancy, and thus his privacy interest in the room, would continue after the expiration of his rental agreement. To the contrary, the record reveals that Jansen renewed his rental agreement only once, and that he did so prior to the noon checkout. In fact, housekeeping records prepared at 6:49 a.m. on January 13, 1999, the morning after Jansen's arrival at the hotel, already showed Jansen's expected checkout as January 19, 1999.

¶ 26 Thus, nothing in the record before us suggests that the hotel had a history of allowing Jansen to renew his rental agreement after the noon checkout time. Moreover, by noon on January 19, the hotel management was aware that Jansen and Weekley were using their hotel room for what appeared to be a drug manufacturing operation. At the very least, they were aware that defendants

had dangerous chemicals, sodium cyanide and acid, in the room.

¶ 27 Upon the expiration of the rental period, a hotel guest no longer has a right to use the room and loses any privacy interest associated with it. *State v. Ahumada*, 125 Ariz. 316, 318, 609 P.2d 586, 588 (App.1980). A hotel may terminate a guest's rental agreement if he engages in unlawful or objectionable conduct. *See, e.g., United States v. Allen*, 106 F.3d 695, 699 (6th Cir. 1997) (defendant's tenancy in motel lawfully ceased "both because he was not allowed to store illegal drugs on the premises and because his pre-paid rental period had elapsed"); *People v. Minervini*, 20 Cal. App.3d 832, 840, 98 Cal.Rptr. 107 (1971) (motel has right to exclude guest from premises because of his unlawful conduct).

¶ 28 In this case, by the time any Fourth Amendment search of the hotel room occurred, the hotel management had already terminated defendants' occupancy both because of the apparently illegal conduct and because Jansen's rental agreement had expired. Defendants no longer had a justifiable privacy interest in the hotel room or its contents. Accordingly, the officers' search of the hotel room and seizure of the items therein did not violate the defendants' Fourth Amendment rights.

## CONCLUSION

¶ 29 We reverse the trial court's suppression order. We hold that, under the facts of this case, the seizure of evidence from the defendants' hotel room did not violate their Fourth Amendment rights. Because the trial court believed that the illegality of the search of the hotel room tainted all evidence subsequently obtained by the police, it ordered the suppression of all the evidence seized in this case, including evidence obtained from the defendants' persons, from Weekley's automobile, and from the storage unit rented in Weekley's name. Our holding necessarily vitiates that portion of the trial court's ruling. Weekley, however, independently argued that, regardless of the legality of the search of his hotel room, the subsequent warrantless search of his automobile and the resulting search of the storage unit rented in his name violated his right to be free from unreasonable searches and seizures. Because of the nature of its ruling, the trial court did not reach these issues. We therefore remand this matter to the trial court for a resolution of these issues and for further proceedings consistent with this decision.

CONCURRING: MICHAEL D. RYAN, Presiding Judge, PHILIP L. HALL, Judge.