IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| THE STATE OF ARIZONA, | ) | |
| | ) | 2 CA-CR 2007-0122 |
| Appellee, | ) | DEPARTMENT A |
| | ) | |
| v. | ) | O P I N I O N |
| | ) | |
| JACK JUDE MARTINEZ, JR., | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. CR-20054070

Honorable Richard S. Fields, Judge

AFFIRMED

Terry Goddard, Arizona Attorney General
  By Kent E. Cattani and Melissa A. Parham                                      Phoenix
                                                        Attorneys for Appellee

John William Lovell                                                            Tucson
                                                        Attorney for Appellant

P E L A N D E R, Chief Judge.

¶1 After a jury trial, Jack Jude Martinez, Jr. was convicted of second-degree burglary. The trial court sentenced him to an aggravated, seven-year prison term. On appeal, Martinez contends the court erred by admitting evidence of Martinez's statements to a neighboring jail inmate and a letter he sent his girlfriend. He also argues the prosecutor committed misconduct. Finding no error, we affirm.

**Background**

¶2 "We view the facts in the light most favorable to sustaining the conviction[]." *State v. Robles*, 213 Ariz. 268, ¶ 2, 141 P.3d 748, 750 (App. 2006). In September 2005, Martinez was living with his girlfriend, L. Maria Cano (L.'s mother) and Cano's roommate lived in a different residence and, according to Cano's testimony, were storing 800 pounds of marijuana in their laundry room. Cano told her daughter about the drugs.

¶3 Martinez, in turn, learned of the marijuana stored at Cano's house and told a number of acquaintances about it. He told at least one friend that taking the marijuana "would be an easy way to make money." A few days later, Martinez went to work in the morning at his construction job. At about 10 a.m., during his lunch break, Martinez left the job site with two co-workers, T. and C., in T.'s truck. The job foreman testified none of them had returned to work that day and they had removed "extra tools" and "junk" from the back of T.'s truck when they left.

¶4 Around noon that same day, a motorist saw a body lying on a walkway outside Cano's residence and called 911. The body was C., who had been shot and was dead when

2

police arrived. Officers found and confiscated 569 pounds of marijuana from Cano's laundry room. Police also found signs of forced entry into that room. Martinez's fingerprints were subsequently discovered on some plastic garbage bags covering the marijuana.

¶5 Martinez was charged with first-degree felony murder, attempted aggravated robbery, and second-degree burglary.[1] He testified at trial that his fingerprints were on the garbage bags because he had placed his dirty clothes in them and his girlfriend had done laundry at Cano's residence. He also claimed T. and C. had left him downtown during the lunch hour and he eventually had taken a bus home after learning he had been fired from his job. Martinez testified he had first learned of the homicide from a television news report that night and denied having been at Cano's residence at all that day or having participated in any burglary, theft of marijuana, or shooting there. After a seven-day trial, the jury found Martinez guilty of second-degree burglary but acquitted him of felony murder.[2] This appeal followed.

**Discussion**

**I. Admissibility of inmate's testimony**

¶6 Martinez first contends the trial court erred in denying his pretrial motion to preclude the testimony of H. Jones, a fellow jail inmate, about statements Martinez had made while in jail awaiting trial. The day after his arrest, on September 28, 2005, Martinez was

---

[1]Cano and her roommate also were charged with felony murder, possession of marijuana for sale, and attempted sale of marijuana, but those charges were later dropped.

[2]The state dismissed the attempted aggravated robbery charge during trial.

taken to the Pima County Jail and placed in a cell adjacent to Jones, an inmate charged with armed robbery and aggravated assault. Within an hour after Martinez's arrival, Jones had a scheduled meeting at the jail with his attorney. Jones told his counsel that the man in the cell next to him, Martinez, had been discussing his case with Jones. After the meeting, Jones's attorney contacted the prosecutor about arranging a "free talk" with Jones.[3] Jones was then returned to his same cell.

¶7 The next day, Jones's change-of-plea hearing was continued because "extraordinary circumstances exist and delay is indispensable to the interests of justice." The free talk between Jones and a police detective occurred on October 14, 2005. Jones was relocated to another jail cell about a week later. Thereafter, the prosecutor decided to use Jones as a witness in this case in exchange for lowering the possible sentencing range Jones would face in his own case. Jones ultimately was offered and accepted a revised plea that reduced his maximum exposure to prison by eleven years.

¶8 In July 2006, Martinez moved to preclude Jones's testimony, arguing that Jones had acted as a state agent in obtaining incriminating statements from Martinez, thus violating his Sixth Amendment right to counsel. *See Massiah v. United States*, 377 U.S. 201 (1964). The trial court held an evidentiary hearing, at which Jones and Martinez testified. Jones testified Martinez had started "spilling his guts" "[a]lmost immediately" when Martinez first arrived at the jail. According to Jones, he and Martinez had communicated regularly through

_____

[3]At that time, the same prosecutor was assigned to both this case and Jones's.

the air vents from that day until the free talk in October. Jones testified no one from the state had asked him to seek information from Martinez and his counsel testified she had not given him any direction either.

¶9        At the hearing, Martinez contradicted Jones's testimony, explaining Jones had initiated their first conversation through the vents by asking Martinez why he was in jail. According to Martinez, Jones also initiated the later conversations. The trial court later denied Martinez's motion to preclude, ruling Jones's testimony admissible because he had not acted as a state agent when he spoke with Martinez. At trial, Jones testified Martinez had told him he had forcibly "broken into" Cano's residence, taken some marijuana and, that during "a struggle" inside the residence between T. and C., C. had been shot. Martinez denied having made any incriminating statements to Jones.

¶10        As he did below, Martinez contends Jones's testimony about Martinez's statements violated his Sixth Amendment right to counsel. Generally, we review a trial court's ruling on the admission of evidence for an abuse of discretion. *State v. Roscoe*, 184 Ariz. 484, 491, 910 P.2d 635, 642 (1996); *State v. McCurdy*, 216 Ariz. 567, ¶ 6, 169 P.3d 931, 935 (App. 2007). But we review de novo alleged violations of one's constitutional right to counsel. *State v. Boggs*, 218 Ariz. 325, ¶ 50, 185 P.3d 111, 122 (2008); *State v. Rasul*, 216 Ariz. 491, ¶ 4, 167 P.3d 1286, 1288 (App. 2007).

¶11        The Sixth Amendment right to counsel is triggered "at or after the time that judicial proceedings have been initiated." *Fellers v. United States*, 540 U.S. 519, 523 (2004);

5

*see also State v. Moody*, 208 Ariz. 424, ¶ 65, 94 P.3d 1119, 1140 (2004) (right to counsel attaches at critical stage of criminal proceedings). The parties do not dispute that occurred in this case on September 28, 2005, when the state filed an interim complaint against Martinez after his arrest. Under *Massiah*, the state violates a defendant's right to counsel "when it deliberately elicit[s] incriminating information from an indicted [defendant] who was entitled to assistance of counsel." *State v. Berndt*, 138 Ariz. 41, 44, 672 P.2d 1311, 1314 (1983); *see also State v. Smith*, 107 Ariz. 100, 103, 482 P.2d 863, 866 (1971). Police may not "use a paid informant-prisoner to surreptitiously elicit incriminating information" once the right to counsel has attached. *Berndt*, 138 Ariz. at 44, 672 P.2d at 1314; *see also United States v. Henry*, 447 U.S. 264, 270-71 (1980); *Massiah*, 377 U.S. at 206.

¶12 The state, however, only violates a defendant's right to counsel if the informant is acting as a state agent when he obtains the statements. *See Smith*, 107 Ariz. at 103, 482 P.2d at 866 (state must actively enter picture to obtain desired information); *see also State v. Ferrari*, 112 Ariz. 324, 331, 541 P.2d 921, 928 (1975); *State v. Jensen*, 111 Ariz. 408, 412, 531 P.2d 531, 535 (1975). Thus, Martinez "must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986); *see also State v. Kemp*, 185 Ariz. 52, 58, 912 P.2d 1281, 1287 (1996). Based on the record and applicable law, we cannot say the trial court erred in finding "insufficient evidence to conclude that the

6

State more likely than not encouraged or directed . . . Jones to acquire information from [Martinez] prior to [the free talk on] October 14, 2005."

¶13        Martinez asserts, however, either an "implied or express" agency relationship was created on September 28, when Jones met with his attorney, because that same day the prosecutor and lead detective in Martinez's case were contacted and Jones "receiv[ed] a benefit" the next day when his case was continued.[4]  Additionally, Martinez emphasizes the following facts:  Jones remained in the same cell adjacent to Martinez from September until a week after the free talk; the trial court found Jones must have obtained additional information from Martinez after September 28; Martinez testified Jones had initiated the conversations; and some testimony by Jones's counsel suggested the state disclosed Jones as a witness before his free talk on October 14.[5]  In response, the state points out Martinez initiated conversation with Jones by "spilling his guts" about his case; the state "did not even know what information [Jones] had to offer until after the free talk"; and the state never communicated with Jones on or after September 28 until the free talk in October and did not direct or encourage Jones to elicit more information from Martinez.

¶14        We view the evidence adduced at the hearing on Martinez's motion to preclude in the light most favorable to sustaining the trial court's ruling.  *See State v. Weekley*, 200

---

[4]Martinez also claims that, via the call by Jones's attorney to the prosecutor on September 28, "the State obtained information it intended to use at the grand jury hearing to secure an indictment."  But we find no factual support for that argument in either the grand jury transcript or any testimony at the evidentiary hearing on Martinez's motion to preclude.

[5]Martinez does not cite, nor have we found, any such disclosure in the record.

7

Ariz. 421, ¶ 3, 27 P.3d 325, 326 (App. 2001); *see also State v. Flower*, 161 Ariz. 283, 286 n.1, 778 P.2d 1179, 1182 n.1 (1989). Whether a private person acted as a state agent is "'a fact-intensive inquiry that is guided by common law agency principles.'" *United States v. Jarrett*, 338 F.3d 339, 344 (4th Cir. 2003), *quoting United States v. Ellyson*, 326 F.3d 522, 527 (4th Cir. 2003); *see also Ruesga v. Kindred Nursing Centers, L.L.C.*, 215 Ariz. 589, ¶ 21, 161 P.3d 1253, 1259 (App. 2007) (question of fact whether agency relationship existed); *State v. Estrada*, 209 Ariz. 287, ¶ 17, 100 P.3d 452, 456 (App. 2004) ("Whether a private citizen acted as a state agent is determined on a case-by-case basis . . . ."). And we "defer to the trial court's assessment of witness credibility because the trial court is in the best position to make that determination." *State v. Olquin*, 216 Ariz. 250, ¶ 10, 165 P.3d 228, 230 (App. 2007); *see also Estrada*, 209 Ariz. 287, ¶ 22, 100 P.3d at 457.

¶15        Viewed in light of the foregoing principles, the record supports the trial court's finding that no agency relationship existed between the state and Jones before his free talk on October 14. Even if Jones initiated the conversations and purposefully elicited statements from Martinez in the hopes of receiving a more favorable sentence for himself, nothing in the record suggests the state directed or encouraged him to do so. As the court stated in *Smith*:

> [I]t should be emphasized that law enforcement officials have the right, and indeed the obligation in the prosecution of crimes to use all information that comes into their hands pointing to the guilt of an accused. This is true even though the persons supplying that information may harbor expressed or unexpressed motives of expectation of lenient treatment in exchange for such

8

information. It is only when the state actively enters into the picture to obtain the desired information in contravention of constitutionally protected rights that the sanction of inadmissibility becomes pertinent.

107 Ariz. at 103, 482 P.2d at 866.

¶16 Jones testified at the hearing that he hoped Martinez's statements would help his case but he "didn't know that at the time." In the time frame during which Jones talked with Martinez, the state did not promise Jones a more lenient sentence in exchange for information. In addition, Jones was not a known police informant, received no direction from the state about whether or how to question Martinez, and had no communication with the state between September 28 and his free talk in October. *See State v. Stevens*, 158 Ariz. 595, 597, 764 P.2d 724, 726 (1988) (inmate not state agent when no evidence police asked him to elicit information); *Ferrari*, 112 Ariz. at 331, 541 P.2d at 928 (not state agent where informant initiated conversation and no police direction). Therefore, the trial court did not err in denying Martinez's motion to preclude based on its factual finding that Jones had not acted as a state agent.

## II. Admissibility of letter

¶17 Martinez next argues the trial court erred in denying his motion to suppress letters he had sent his girlfriend L. from jail, but which Cano, L.'s mother, had intercepted and then turned over to the state. Although Martinez contests the admissibility of all the letters Cano found and seized, we need only address the last letter Martinez sent because it was the only letter actually admitted into evidence at trial. In that letter, Martinez told L. she

9

must testify she had taken a box of "old," "used" garbage bags to her mother's house and left it in the laundry room. He wrote that it was "important" for L. to "remember these details precisely or [he was] f-----." He also instructed L. to burn the part of the letter in which he had told her what to say.

¶18            The state responds, as it did below, that Martinez lacks standing to challenge on Fourth Amendment grounds Cano's seizure of the letter and that she had not been acting as a state agent when she took the letter from her mailbox. The trial court denied the motion to suppress, agreeing with the state that Martinez lacked standing. "We review the court's ruling for an abuse of discretion, considering only the evidence presented at the suppression hearing and viewing that evidence in the light most favorable to sustaining the trial court's ruling."[6] *State v. Moreno-Medrano*, 218 Ariz. 349, ¶ 3, 185 P.3d 135, 137 (App. 2008). We review the court's legal conclusions de novo. *Id*.; *see also State v. Smith*, 197 Ariz. 333, ¶ 2, 4 P.3d 388, 390 (App. 1999). Although we conclude Martinez had standing to challenge the seizure, we affirm the trial court's ruling because the record supports the court's implicit finding that Cano had not been acting as a state agent when she confiscated the letter.

¶19            After Martinez's arrest, his girlfriend L. lived with Cano while Martinez was in jail awaiting trial. At a pretrial interview, the prosecutor informed Cano that her daughter

_____

[6]The trial court did not hold an evidentiary hearing on the motion to suppress because the parties agreed to allow the court to examine the standing issue based on transcripts of defense interviews with Cano and her daughter. We similarly rely solely on those transcripts in reviewing the court's ruling. *See Moreno-Medrano*, 218 Ariz. 349, ¶ 3, 185 P.3d at 137.

might commit perjury at Martinez's trial. Cano responded that she knew "the way [Martinez's] mind works" and that he probably had instructed her daughter about what she should say in her testimony. Cano told the prosecutor she would look for letters Martinez had sent her daughter and give them to him. The prosecutor replied, "fine," and told Cano to call him and he would pick up the letters.

¶20 A few days before Martinez's scheduled trial date, on or about December 7, 2006, Cano took directly from her mailbox the most recent letter Martinez had sent to L., before L. received or saw it. She opened the sealed letter, made a copy, and called her attorney, who picked up that and other letters Cano had collected. Her attorney told Cano "[t]hey were going to look through them." In a defense interview, Cano stated the "only reason" she had searched for and taken the letters was because she was "trying to save [her] daughter" from committing a crime. She also was concerned because Martinez was older than her daughter and was capable of easily "brainwash[ing] her."

**A. Standing**

¶21 The trial court denied Martinez's motion to suppress, ruling he lacked "standing to urge the motion." On appeal, Martinez maintains he has standing because the letter is an "effect" within the meaning of the Fourth Amendment and, as the sender of the letter, he had a reasonable expectation of privacy in it. The Fourth Amendment provides that persons shall be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see also Weekley*, 200 Ariz. 421, ¶ 16, 27

11

P.3d at 328. "[A] person claiming a violation of the Fourth Amendment must have 'a legitimate expectation of privacy in the invaded place.'" *State v. Juarez*, 203 Ariz. 441, ¶ 12, 55 P.3d 784, 787 (App. 2002), *quoting Illinois v. Rakas*, 439 U.S. 128, 143 (1978). And, that subjective expectation of privacy must be "'one that society is prepared to recognize as "reasonable."'" *Rakas*, 439 U.S. at 143-44 n.12, *quoting Katz v. United States*, 389 U.S. 347, 361 (1967); *see also Juarez*, 203 Ariz. 441, ¶ 12, 55 P.3d at 787.[7]

**¶22**        The state does not dispute that a letter is an "effect" protected by the Fourth Amendment. *See United States v. Jacobsen*, 466 U.S. 109, 114 (1984) ("Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy. . . ."). The state argues, however, Martinez's expectation of privacy

---

[7]On appeal, the parties address this issue as one of standing, as did the trial court below. But in *Rakas*, the Supreme Court concluded that the traditional "standing requirement . . . is more properly subsumed under substantive Fourth Amendment doctrine." 439 U.S. at 139. Although the Court acknowledged "[t]he inquiry under either approach is the same," it stated "the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." *Id*. "Thus, our state appellate courts, after *Rakas* dispensed with 'standing' as a separate inquiry, have conceptually incorporated 'standing' as a substantive part of our state's search and seizure law." *Juarez*, 203 Ariz. 441, ¶ 16, 55 P.3d at 788. Although this threshold issue technically now falls "within the purview of substantive Fourth Amendment law [rather] than within that of standing," the necessary "determination" is essentially the same—"whether the proponent of a motion to suppress is entitled to contest the legality of a search and seizure." *Rakas*, 439 U.S. at 140. And here, that determination hinges on whether Martinez had a reasonable or "legitimate expectation of privacy" in his letter to L. after it left the jail and before she received it. *State v. Tarkington*, 218 Ariz. 369, ¶ 7, 187 P.3d 94, 95 (App. 2008); *see also Juarez*, 203 Ariz. 441, ¶ 12, 55 P.3d at 787.

ended "when the item reache[d] its destination"—the shared mailbox of his girlfriend L. and her mother.

¶23 In contrast, Martinez maintains his expectation of privacy did not end until L. "took possession of the letter" because "[m]ail is not deemed delivered until it is received by the person to whom it is addressed." In support of his argument, Martinez cites 18 U.S.C. § 1702, which defines "[o]bstruction of correspondence" as a person "tak[ing] any letter, postal card, or package . . . before it has been delivered to the person to whom it was directed." *See also Maxwell v. United States*, 235 F.2d 930, 932 (8th Cir. 1956) (clear intent of statute to "protect a letter from theft from the time it is mailed until it has actually been received by the person to whom it is addressed").

¶24 Although not cited by the parties, *State v. Hubka*, 10 Ariz. App. 595, 461 P.2d 103 (1969), addressed a similar standing issue to that raised here and supports Martinez's position. In that case, the defendant sent a letter to an addressee at a fire station, offering to pay him to kill her husband, but the addressee was not there when the letter arrived. *Id*. at 596, 461 P.2d at 104. Before the addressee picked up the letter, a member of the fire department held it up to the light, saw part of its contents, and called police. *Id*. Without a warrant, a police officer opened and read the letter. *Id*. In finding that Hubka had standing to challenge the seizure, the court discussed 18 U.S.C. § 1702 and *Maxwell*, concluding that a letter sent through the mail should be protected from unreasonable searches and seizures "until actual receipt by the addressee." *Id*. at 597, 461 P.2d at 105.

13

¶25 The cases the state cites for its argument that Martinez's expectation of privacy ended when his letter was delivered are distinguishable because in those cases, the addressee actually received the letters. *See United States v. Dunning*, 312 F.3d 528, 530-31 (1st Cir. 2002) (defendant's letter to girlfriend received by her and later seized in search of her home); *United States v. Gordon*, 168 F.3d 1222, 1228 (10th Cir. 1999) (no standing when defendant sent letters to inmates who received letters only after prison officials intercepted them); *United States v. King*, 55 F.3d 1193, 1196 (6th Cir. 1995) (expectation of privacy in letters addressed to wife terminated on delivery to her). Here, however, Cano took the letter out of the mailbox before L. received it or was even aware it existed. *See Hubka*, 10 Ariz. App. at 598, 461 P.2d at 106 (recipient unaware of letter's existence). Although *Hubka* did not involve a letter sent by a jail inmate, we find it controlling and follow it here. *See also Dunning*, 312 F.3d at 531 ("if a letter is sent to another, the sender's expectation of privacy ordinarily terminates upon delivery" to intended recipient). Under the law, therefore, Martinez had a reasonable expectation of privacy in the letter until the addressee, L., received it.

¶26 The state also argues, however, Martinez lacked standing because inmates in prison or jail have no legitimate expectation of privacy in their outgoing mail. "Prison officials may inspect and examine the communications of inmates without depriving them of their constitutional rights," *State v. Jeffers*, 135 Ariz. 404, 413, 661 P.2d 1105, 1114 (1983); *see also Wolff v. McDonnell*, 418 U.S. 539, 575-77 (1974); *Stroud v. United States*,

251 U.S. 15, 21-22 (1919). And it is well established that prisoners have no legitimate expectation of privacy in their prison cells. *See Hudson v. Palmer*, 468 U.S. 517, 530 (1984). These principles apply not only to convicted prisoners but also to pretrial detainees confined in jail. *See Bell v. Wolfish*, 441 U.S. 520, 546-47 and 546 n.28 (1979); *United States v. Brown*, 878 F.2d 222, 225 (8th Cir. 1989); *see also Smith v. Shimp*, 562 F.2d 423, 426 (7th Cir. 1977) ("jail officials may read outgoing nonprivileged mail"); *State v. Apelt*, 176 Ariz. 349, 364, 861 P.2d 634, 649 (1993) (Fourth Amendment did not apply to letters seized from jail cell); *People v. Phillips*, 555 N.W.2d 742, 743 (Mich. App. 1996) (rationale underlying *Hudson* "applies equally to pretrial detainees and inmates confined in jails"); *State v. Wiley*, 565 S.E.2d 22, 32 (N.C. 2002) ("jail officials do not violate an inmate's Fourth Amendment rights by inspecting the inmate's mail").

¶27 Nonetheless, even "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell*, 441 U.S. at 545; *Wolff*, 418 U.S. at 555-56. Thus, "[t]he door on prisoner's rights against unreasonable searches has not been slammed shut and locked." *United States v. Cohen*, 796 F.2d 20, 23 (2d Cir. 1986). Rather, "the loss of such rights is occasioned only by the *legitimate* needs of institutional security," and "a limitation imposed on prisoners' constitutional rights cannot stand when the objectives the rationale serves are absent." *Id.* at 23, 24; *see also Bell*, 441 U.S. at 546 ("maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional

15

rights of both convicted prisoners and pretrial detainees"); *Jeffers*, 135 Ariz. at 414, 661 P.2d at 1115 (noting legitimate concerns of inmate security and prevention of crimes in jail).

¶28 "[T]he threshold determination of whether a prisoner's expectation is 'legitimate' or 'reasonable,' and thus deserving of the Fourth Amendment's protection, necessarily entails a balancing of the security interest of the penal institution against the privacy interest of the prisoner." *Wiley*, 565 S.E.2d at 32. But this case requires no such balancing because it does not involve jail officials screening an inmate's mail or searching a cell. Nor are any policies or interests relating to jail security or safety implicated here.

¶29 In sum, "[g]iven the realities of institutional confinement, any reasonable expectation of privacy a detainee retains necessarily is of diminished scope." *Wiley*, 565 S.E.2d at 32. *See also Cohen*, 796 F.2d at 24 (defendant retained "Fourth Amendment right—though much diminished in scope—" to challenge warrantless, investigatory search of cell ordered by prosecutor); *State v. Cuypers*, 481 N.W.2d 553, 557 (Minn. 1992) (jail inmate's "reasonable expectation of privacy is necessarily restricted" and not violated when jailers seized his letters "pursuant to a constitutionally valid jail regulation"). But the state cites no authority to support its suggestion that, based on his mere status as a jail inmate, Martinez had no reasonable or legitimate expectation of privacy regarding the letter he sent to L., even after that letter left the jail. Therefore, we disagree with the state's position and the trial court's conclusion that Martinez lacked standing to assert his Fourth Amendment argument. We may affirm the court's ruling if it is correct on other grounds, however, and

16

do so here for the reasons stated below. *See State v. Box*, 205 Ariz. 492, ¶ 13, 73 P.3d 623, 627 (App. 2003).

## B. State agency

¶30  Although Martinez had standing to challenge Cano's seizure of the letter, which the state then obtained and introduced at trial, we must also address whether Cano was acting as a state agent. Before ultimately concluding that Martinez lacked standing, the trial court, relying on *State v. Weinstein*, 190 Ariz. 306, 947 P.2d 880 (App. 1997), implicitly found no such agency relationship existed. In *Weinstein*, a private mail carrier opened a package it suspected contained narcotics. *Id*. at 307, 947 P.2d at 881. When employees discovered a substance inside other than a letter, they called a government narcotics task force. *Id*. Although this court discussed the "ongoing relationship" between a narcotics law enforcement officer and the store employees, we determined that the "level of police involvement [in that case was] insufficient to meet the requisite degree of governmental participation necessary to convert [a store employee] into an agent of the state." *Id*. at 309, 947 P.2d at 883. As this court noted,

> "While a certain degree of governmental participation is necessary before a citizen is transformed into an agent of the state, *de minimis* or incidental contacts between the citizen and law enforcement agents prior to or during the course of a search or seizure will not subject the search to [F]ourth [A]mendment scrutiny. The government must be involved either directly as a participant or indirectly as an encourager of the private citizen's actions . . . ."

17

*Id.* at 309, 947 P.2d at 883, *quoting United States v. Walther*, 652 F.2d 788, 791-92 (9th Cir. 1981).

¶31 An unreasonable search performed "by a private citizen does not violate the Fourth Amendment unless the citizen is acting as an agent of the state." *Estrada*, 209 Ariz. 287, ¶ 16, 100 P.3d at 456; *see also Jacobsen*, 466 U.S. at 113-15; *State v. Best*, 146 Ariz. 1, 2, 703 P.2d 548, 549 (App. 1985). We examine the following two factors in determining whether a private party acted as a state agent: "'(1) the government's knowledge and acquiescence, and (2) the intent of the party performing the search.'" *Weinstein*, 190 Ariz. at 309, 947 P.2d at 883, *quoting Walther*, 652 F.2d at 792; *see also Estrada*, 209 Ariz. 287, ¶ 17, 100 P.3d at 456. If either element of this test is not met, then the private citizen was not acting as a state agent. *See United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994). And a private party's "wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully." *Walter v. United States*, 447 U.S. 649, 656 (1980); *see also Estrada*, 209 Ariz. 287, ¶ 16, 100 P.3d at 456.

¶32 We first examine to what extent the state had knowledge of Cano's actions and whether it acquiesced in her seizure of Martinez's letter to L. *See Weinstein*, 190 Ariz. at 309, 947 P.2d at 883. When the prosecutor expressed his belief to Cano in a pretrial meeting that L. would commit perjury, Cano said she would "look through" the letters to see if Martinez was directing L. what to say, and said she would "turn them in" to the prosecutor. The prosecutor then said, "fine." Although the prosecutor knew Cano was going to search

18

for and seize the letters, his reply of "fine" did not directly involve the government in Cano's activities. *See id*.

¶33        But even assuming the prosecutor's reply indirectly encouraged Cano to seize the letter or manifested the state's "knowledge and acquiescence" in her doing so, *see id*., Martinez's Fourth Amendment rights are implicated only if Cano acted on behalf of the state without "a legitimate independent motivation for conducting the search." *Walther*, 652 F.2d at 792. As the state points out, Cano did not like Martinez and was concerned that her daughter might commit perjury because Martinez was telling her what to say in her testimony. In her defense interview, Cano said her only interest was to "protect[]" or "save" her daughter, who had just turned eighteen years of age, from the "brainwash[ing]" influence of Martinez, who was in his early thirties.

¶34        Martinez argues Cano intended to assist the state in proving its case, at least in part, because she was in "potential criminal trouble" for having marijuana stored at her house. But the record reflects the charges against Cano were dropped in March 2006, before Martinez wrote the letter in December 2006 and before Cano retrieved and gave it to her attorney, who apparently then gave it to the state.[8] Thus, her motive in seizing Martinez's letter and giving it to the prosecutor was personal in nature rather than based on a desire to

---

[8]The parties do not say, nor does the record reflect, precisely how or when the state obtained the letter in question. In his motion to suppress, however, Martinez claimed the state had disclosed all of the letters shortly after Cano had seized them, several months before the case ultimately was tried.

19

assist law enforcement. *Cf. Weinstein*, 190 Ariz. at 309-10, 947 P.2d at 883-84 (private actor not acting as government agent when he called police out of civic duty and desire to protect children). And, as the trial court noted, the facts of this case are similar to the facts in *Weinstein* because the prosecutor did not encourage Cano to take the letter. Resolving all reasonable inferences in favor of sustaining the trial court's ruling, we find sufficient support in the record for the court's implicit finding that Cano had acted primarily, if not solely, to protect her daughter rather than to help the prosecutor prove his case. *See State v. Steiger*, 134 Ariz. 268, 270, 655 P.2d 808, 810 (App. 1982). We cannot say the court committed clear and manifest error in denying Martinez's motion to suppress the letter. *See State v. Walker*, 215 Ariz. 91, ¶ 16, 158 P.3d 220, 223 (App. 2007); *Weinstein*, 190 Ariz. at 308, 947 P.2d at 882.

### III. Prosecutorial misconduct

¶35 Finally, Martinez argues the prosecutor engaged in misconduct in two respects: (1) "sending Mr. Jones back to his cell and in failing to instruct [him] not to elicit information from [Martinez] about his case," and (2) "allowing Ms. Cano [to] unlawfully seize the letters." Martinez failed to raise any claims of prosecutorial misconduct below at any stage of the proceedings. Therefore, we review for fundamental, prejudicial error, which Martinez first asserts, belatedly, in his reply brief. *See State v. Henderson*, 210 Ariz. 561, ¶¶ 19-20, 115 P.3d 601, 607 (2005); *see also State v. Bocharski*, 218 Ariz. 476, ¶ 74, 189 P.3d 403, 418 (2008); *State v. Guytan*, 192 Ariz. 514, ¶ 15, 968 P.2d 587, 593 (App. 1998)

20

(arguments raised for first time in reply brief waived). In light of our discussion above on the first two issues Martinez raises, we conclude he has failed to meet his burden to establish any error, fundamental or otherwise, occurred. *See Henderson*, 210 Ariz. 561, ¶ 19, 115 P.3d at 607.

¶36 "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *State v. Hughes*, 193 Ariz. 72, ¶ 26, 969 P.2d 1184, 1191 (1998), *quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Misconduct is defined as conduct that "is not merely the result of legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to intentional conduct which the prosecutor knows to be improper and prejudicial." *Pool v. Superior Court*, 139 Ariz. 98, 108-09, 677 P.2d 261, 271-72 (1984); *see also State v. Aguilar*, 217 Ariz. 235, ¶ 11, 172 P.3d 423, 426-27 (App. 2007). We will reverse a conviction "if the cumulative effect of the alleged acts of misconduct 'shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not specific intent, to prejudice the defendant.'" *Bocharski*, 218 Ariz. 476, ¶ 74, 189 P.3d at 419, *quoting State v. Roque*, 213 Ariz. 193, ¶ 155, 141 P.3d 368, 403 (2006).

¶37 Martinez maintains the prosecutor used "improper methods calculated to produce a wrongful conviction" by using Jones and Cano to elicit incriminating information because the state had a weak case. But as we discussed above, neither Jones nor Cano was

21

a state agent or acted under the state's authority. Therefore, Martinez has not established the prosecutor acted intentionally, *Bocharski*, 218 Ariz. 476, ¶ 74, 189 P.3d at 419, and has failed to prove fundamental error.

**Disposition**

**¶38**　　　Martinez's conviction and sentence are affirmed.


_____
　　　　　　　　　　　　　JOHN PELANDER, Chief Judge

CONCURRING:


_____
JOSEPH W. HOWARD, Presiding Judge


_____
PHILIP G. ESPINOSA, Judge